[No. 42391-6-I. Division One. September 13, 1999.]

UNIGARD INSURANCE COMPANY, ET AL., *Appellants*, v. BRUCE LEVEN, *Respondent*.

418

*Mary H. Spillane* of *Williams, Kastner & Gibbs P.L.L.C.*, for appellants.

*Donald J. Verfurth* and *Dianne Kownacki* of *Carney, Badley, Smith & Spellman, P.S.*, for respondent.

AGID, A.C.J. — Unigard Insurance Company filed this declaratory judgment action against Bruce Leven and several corporations he controlled[1] claiming it was not obligated to defend or indemnify Leven against liabilities arising from environmental contamination at eight Washington sites where Leven's corporations operated. The trial court granted Leven's cross motion for summary judgment, rul-

---

[1] The corporate defendants were Bayside Waste Hauling & Transfer, Inc., Liquid Waste Disposal Company, Northwest Garbage, Inc., Rainier Disposal Company, Inc., and Sno-King Garbage, Inc.

ing as a matter of law that Unigard (1) had a duty to defend and/or indemnify Leven personally in two lawsuits brought against Leven's corporation and in a related Department of Ecology enforcement action against Leven, and (2) that Unigard had acted in bad faith and violated the Washington Consumer Protection Act by failing to do so. Because Leven is not entitled to personal coverage under the facts presented here, we reverse.

## FACTS

Bruce Leven, the owner, president, and sole shareholder of Bayside Waste Hauling & Transfer, Inc. (Bayside), a hazardous waste transfer operation, purchased comprehensive general liability insurance policies from Unigard Insurance Company[2] which provided that Unigard would defend and indemnify Bayside and Leven against property damage claims. Leven was individually insured under these policies "with respect to the conduct of a business of which he is the sole proprietor," or "while acting within the scope of his duties" as an executive officer, member of the board of trustees, or stockholder of Bayside. An exclusion for personal liability provided that Leven did not have coverage for all personal acts not in direct conduct of the business of the Named Insured.[3]

In April 1982, Bayside acquired the assets and name of Liquid Waste Disposal Company (LIDCO), a toxic waste hauling and disposal company. Bayside operated under the LIDCO name until October 26, 1982, and in that capacity took over LIDCO's lease of property from Standard Equipment Co. in Kent, Washington (the LIDCO site). After October 26, 1982, Bayside continued its business operations at the site, but leased the property directly from Standard Equipment. In November 1982, the City of Kent noti-

---

[2]The policy periods ranged from February 1, 1977 to February 1, 1985 and from February 1, 1986 to February 1, 1987. Only the policies in effect from February 1, 1982 to February 1, 1985 are at issue in this appeal.

[3]The Named Insured was Bayside Waste Hauling & Transfer, Inc.

fied Bayside that its LIDCO operations violated city zoning and business licensing laws and that it would have to vacate the site before March 1983. A few months later, closure procedures were commenced under the Resource Conservation and Recovery Act of 1976 (RCRA).[4]

In May 1984, Bayside notified Unigard of a potential claim by Standard Equipment for environmental contamination at the site, and in August and October of 1984, Standard Equipment brought two companion suits against Bayside and other entities it alleged had contributed to property damage on their sites. Bayside tendered defense of the Standard Equipment suits to Unigard, and Unigard retained Clark Davis to defend Bayside under a reservation of rights.[5] Although Leven, individually, was not a named defendant in either action, he retained C. Anthony (Tony) Davis and Robert Davis to handle his personal interests in the litigation.

In 1987, while the Standard Equipment lawsuits were pending, Leven sold all of the Bayside stock to Waste Management, Inc., now known as WMX Technologies. In exchange for a substantial amount of WMX stock, Leven agreed to indemnify and hold harmless WMX for up to $40 million in costs associated with remediating environmental contamination at various sites, including the LIDCO site. Unigard was aware of this agreement.[6]

The two Standard Equipment lawsuits were settled in 1989 under an Offer of Judgment Agreement. The Agreement provided that Standard Equipment would transfer title of the LIDCO site to Bayside, and Bayside would assume the remediation obligations on the site. At the time

---

[4]Washington's Model Toxic Control Act of 1989 (MTCA) was not yet in effect.

[5]Unigard paid all invoices, totaling $411,483, it received for Bayside's defense in the lawsuits through June 1989 when they were dismissed.

[6]Under a January 29, 1993 settlement agreement between WMX and Leven which amended the 1987 acquisition agreement, Leven assumed liability for all eight of the Washington sites Unigard included in its action. In June 1996, WMX and Leven entered into a third agreement under which WMX agreed to release Leven from liability and to hold him harmless and indemnify him for all environmental claims at all sites except the LIDCO site.

of the settlement, Unigard, Bayside, and Leven knew that the Department of Ecology (DOE) was preparing an order directed to Bayside and LIDCO concerning the LIDCO site's remediation. By letter dated June 13, 1989, DOE notified Bayside that it believed Bayside was a potentially liable party (PLP) under the Model Toxic Control Act (MTCA) because it was a "former owner and/or operator" of the LIDCO site.

In July 1989, Leven created Bayside Automotive Storage, Inc. (Bayside Automotive) to hold title to and administer the investigation and remediation activities on the LIDCO site, and on October 16, Bayside transferred title of the LIDCO site by quit claim deed to Bayside Automotive.

In August 1989, the DOE named Bayside a PLP, making Bayside strictly liable, jointly and severally, for investigation and remediation of the contaminated LIDCO site. Unigard knew of Bayside's designation but never received a tender of defense or invoices for expenses in defending the action. On October 12, 1990, DOE sent Bruce Leven a letter notifying him that it proposed to classify him personally as a PLP, as the "former operator" of the LIDCO site. On December 10, DOE notified Leven that he had been designated a PLP. Leven contested the designation but did not inform Unigard about it.

On June 19, 1991, Leven signed, as president of Bayside Automotive, an Agreed Order on Consent with the DOE under which Bayside Automotive was ordered to take specified remedial actions at the LIDCO site. By letter dated April 10, 1992, Tony Davis stated to Unigard that, on behalf of Bayside, its affiliated entities, and Leven, he was formally tendering the defense of "any future or potential governmental action which may be taken concerning . . . [a] RCRA facility assessment being conducted by the Environmental Protection Agency relating to the LIDCO site. . . ." Unigard points out that Davis enclosed a copy of an EPA letter to Clark Davis about the pending RCRA facility assessment, but did not mention the PLP letters issued to Leven in 1990, the pending DOE enforcement action

against Leven, or the Agreed Order against Bayside Automotive. Between 1990 and 1997, neither Bayside nor Leven submitted any invoices or costs of defense to Unigard for payment for any claim involving the LIDCO site. On February 11, 1997, Leven submitted his notebook of invoices for expenses he claimed he had incurred for the LIDCO site. On May 14, 1997, he notified Unigard of the October 12 and December 10, 1990 PLP letters.

In 1993, Unigard filed this action seeking a declaration that it was not obligated to defend or indemnify Leven, Bayside, or related entities for the contamination of the LIDCO site.[7] The trial court granted Leven's motion for summary judgment, but on Unigard's motion for reconsideration, the trial court allowed it the opportunity to conduct additional discovery. Three months later, the parties brought cross motions for partial summary judgment on the duty to defend, the duty to indemnify, bad faith, and Leven's right to attorney fees and costs. After several hearings, the trial court again found that Unigard was obligated to defend and indemnify Leven and awarded Leven attorney fees and costs under *Olympic Steamship Co. v. Centennial Insurance Co.*[8] and the Consumer Protection Act. The trial court found that Unigard acted in bad faith by failing to provide a defense, failing to investigate the claims, failing to make a timely coverage determination, and denying coverage without a sufficient basis.[9] The trial court ordered Unigard to reimburse Leven for all investigation and other defense costs he incurred, and to indemnify Leven for the remediation costs he incurred or will incur in the future at the LIDCO site.

---

[7]Unigard alleged on information and belief that because Leven had agreed to indemnify and/or hold harmless WMX for any potential environmental liability at the LIDCO site, Leven was the real party in interest.

[8]117 Wn.2d 37, 811 P.2d 673 (1991).

[9]The trial court also found that the costs incurred by Leven for the investigation of contamination at the Standard Equipment site were defense costs under WAC 284-30-930(3). Unigard has not appealed this ruling.

## DISCUSSION
### Duty to Defend

Unigard first contends that the trial court erred in holding as a matter of law that Unigard had a duty to defend Leven and pay all of his "past, present and future costs [and] attorneys' fees reasonably incurred in defending the underlying lawsuits and enforcement actions for alleged property damage caused by environmental contamination at the Bayside-Standard Equipment site."[10] Unigard argues that this ruling was error because (1) neither of the Standard Equipment lawsuits was brought against Leven, so Unigard had no duty to defend Leven individually, and (2) Leven's late notice of the MTCA claims prejudiced Unigard, thereby releasing its obligations to defend him in those actions. We agree.

### 1. Standard Equipment Litigation

Unigard regards the Standard Equipment litigation and the subsequent MTCA proceedings as two separate actions, while Leven asserts that "[t]here is but one claim (the Standard Equipment claim)."[11] With respect to the Standard Equipment litigation, Unigard contends that because the duty to defend is determined by the allegations in the complaint[12] and Leven was not a named defendant in the Standard Equipment litigation, Unigard owed only Bayside the duty to defend. As previously noted, Unigard accepted defense of Bayside under a reservation of rights, retained

---

[10]This court reviews summary judgment orders de novo, engaging in the same inquiry as the trial court and assuming facts in the light most favorable to the nonmoving party. *Gingrich v. Unigard Sec. Ins. Co.*, 57 Wn. App. 424, 428, 788 P.2d 1096 (1990).

[11]The trial court did not specifically address this distinction. Its written order focused almost exclusively on Leven's MTCA liability.

[12]*Town of Tieton v. General Ins. Co. of Am.*, 61 Wn.2d 716, 723, 380 P.2d 127 (1963).

Clark Davis to represent it, and paid all invoices it received for Bayside's defense "from inception through dismissal in June 1989 of both *Standard Equipment* lawsuits, with one exception."[13] Even though he was not sued in the Standard Equipment action, Leven retained Robert Davis to advise him individually and sought advice from Tony Davis, in-house counsel for Leven's various companies, as well. Unigard is correct that it has no duty to reimburse Leven for these personal defense costs that Leven voluntarily incurred.

■ ■ Under its policies, Unigard is obligated to defend "any suit *against the Insured* seeking damages on account of . . . property damage." In Washington, an insurer's duty to defend an action brought against its insured arises when a complaint against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured within the policy's coverage.[14] Insurance companies are required to look beyond the allegations of the complaint and reasonably investigate when the allegations are in conflict with facts known to or readily ascertainable by the insurer, or if the allegations of the complaint were ambiguous or inadequate.[15] But a complaint against Bayside, even if construed liberally, does not trigger Unigard's duty to investigate a potential personal claim against Leven. As Unigard notes in a later argument, "Bayside Waste is a corporate entity, separate and distinct from Leven." Unigard's policy contains clear criteria for Leven's personal liability, and until personal liability is alleged, Unigard has no duty to provide coverage for Leven's personal defense costs. Leven's concerns about potential li-

---

[13]Unigard and Leven agreed that they would each pay one-half of lawsuit-related engineering fees, and Leven reserved the right to later recoup his half payment from Unigard.

[14]*Holland Am. Ins. Co. v. National Indem. Co.*, 75 Wn.2d 909, 911, 454 P.2d 383 (1969); *Dickins v. Stiles*, 81 Wn. App. 670, 673, 916 P.2d 435, *review denied*, 129 Wn.2d 1029 (1996).

[15]*Bosley v. American Motorists Ins. Co.*, 66 Wn. App. 698, 701-02, 832 P.2d 1348 (1992), *review denied*, 120 Wn.2d 1030 (1993).

ability, even if legitimate, did not entitle him to retain personal counsel at Unigard's expense.

The trial court concluded that "Unigard was obligated to provide a defense from 1989 to the present based on facts that were then known to it." As Unigard points out, because 1989 was the year of the Standard Equipment settlement, the trial court "implicitly recognized" that Unigard should not have to reimburse Leven for personal defense in litigation to which he was not a party. Yet the trial court's judgment for defense costs included approximately $54,000 of attorney fees Leven paid his personal attorneys in connection with the Standard Equipment litigation. Under the clear terms of the Unigard policy, this award was error. Leven could not have incurred covered expenses defending an action to which he was not a party.

2. MTCA Proceedings

As for the DOE's MTCA proceedings, Unigard contends that Leven's belated notice to Unigard of his personal PLP status prejudiced Unigard and eliminated its duty to defend. The trial court found, and the parties do not dispute, that although the notice clause in Unigard's policies provided that insureds "shall immediately forward to [Unigard] every demand, notice, summons or other process received by him or his representative," Leven did not specifically inform Unigard of the October 12, 1990 letter from DOE naming him a PLP until May 14, 1997. Leven claims, and the trial court agreed, that because Unigard had actual notice of the underlying claims, specific tender was not necessary.

██ Several courts have concluded that a tender of defense is sufficient if the insured puts the insurer on notice of the claim, while others have determined that an insurer's duty to defend does not arise unless the insured specifically asks the insurer to undertake the defense of the

action.[16] In *Time Oil Co. v. Cigna Property & Casualty Insurance*,[17] the United States District Court for the Western District of Washington adopted the latter theory. We agree with the federal court that an insurer cannot be expected to anticipate when or if an insured will make a claim for coverage; the insured must affirmatively inform the insurer that its participation is desired.[18]

■ But even when an insured breaches an insurance contract, the insurer is not relieved of its duty to defend unless it can prove that the late notice resulted in actual and substantial prejudice.[19] To establish actual prejudice, the insurer must demonstrate some concrete detriment, some specific advantage lost or disadvantage created, which has an identifiable prejudicial effect on the insurer's ability to evaluate, prepare or present its defenses to coverage or liability.[20] Unigard contends that the late notice "deprived [it] of the opportunity to show DOE that Leven should not [have been] designated a PLP (or have any MTCA liability) because he was not an 'operator' or 'former operator' of the LIDCO site."[21] Leven responds that because Unigard's purported defense "is not supported in the law in 1990," it cannot show prejudice in this manner. The question, then, is whether Unigard was prejudiced by its inability to argue that Leven should not have incurred individual operator liability under MTCA.

---

[16]*See Hartford Accident & Indem. Co. v. Gulf Ins. Co.*, 776 F.2d 1380, 1383 (7th Cir. 1985).

[17]743 F. Supp. 1400 (W.D. Wash. 1990).

[18]We note that, even if we adopted the notice-only rule, the record does not support Leven's claim that Unigard had actual notice of his *individual* liability. The fact that Unigard was aware of the LIDCO site contamination and of *Bayside's* obligations does not mean that it had notice of Leven's personal liability.

[19]*Pederson's Fryer Farms, Inc. v. Transamerica Ins. Co.*, 83 Wn. App 432, 922 P.2d 126 (1996), *review denied*, 131 Wn.2d 1010 (1997).

[20]*Canron, Inc. v. Federal Ins. Co.*, 82 Wn. App. 480, 486, 491-92, 918 P.2d 937 (1996), *review denied*, 131 Wn.2d 1002 (1997).

[21]Leven challenged his PLP designation on the basis that any hazardous release predated the Bayside operation on the site, and that he "is not, nor has he ever been, an owner 'as defined under RCW 70.105D.020(6),' in that he never owned any of the assets of LIDCO, nor the LIDCO property."

■ MTCA provides that "[t]he owner or operator of the facility"[22] is "strictly liable, jointly and severally, for all remedial action costs and for all natural resource damages resulting from the releases or threatened releases of hazardous substances."[23] MTCA defines "owner or operator" as "[a]ny person with any ownership interest in the facility or who exercises any control over the facility."[24] As both parties note, no Washington case has comprehensively addressed individual operator liability under MTCA. But because it was heavily patterned after the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA)[25] and its 1986 reenactment, the Superfund Amendments and Reauthorization Act (SARA), federal cases interpreting similar "owner or operator" language in CERCLA are persuasive authority in determining whether DOE appropriately designated Leven a PLP.[26]

DOE designated Leven because of his status as a "former operator" of the LIDCO site.[27] Federal courts have struggled to identify the appropriate standard for imposing CERCLA liability on an officer or shareholder of the corporate owner of a facility at which hazardous substances were disposed. "The weight of authority strongly favors application of the actual-participation/exercise of control stan-

---

[22]RCW 70.105D.040(1)(a).

[23]RCW 70.105D.040(2). *See also Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.*, 123 Wn.2d 891, 874 P.2d 142 (1994); *Car Wash Enters., Inc. v. Kampanos*, 74 Wn. App. 537, 544, 874 P.2d 868 (1994).

[24]RCW 70.105D.020(12)(a).

[25]42 U.S.C. § 9601.

[26]*See Bird-Johnson Corp. v. Dana Corp.*, 119 Wn.2d 423, 833 P.2d 375 (1992).

[27]Bayside was designated as both an owner *and* operator because although Bayside did not hold title to the LIDCO site at the time of the alleged contamination, MTCA defines "facility" to include not just the site, but any equipment or instrumentality operated on the site as well. *See* RCW 70.105D.020(4). But because Leven did not personally hold title to the LIDCO site or to the Bayside equipment, DOE could not have premised its PLP designation of him on Leven's status as an owner.

dard."[28] With few exceptions, courts have been unwilling to impose CERCLA liability upon a non-owner of the property if the party did not participate in, or actually exercise control over, the operations of the facility.[29] In *United States v. Bestfoods*,[30] the Supreme Court stated that to incur CER-CLA liability, an operator must "manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."[31] Although this case addressed the liability of parent corporations for their polluting subsidiaries, its reasoning is applicable to individual shareholder liability as well. As the Fifth Circuit noted in *Riverside Market Development Corp. v. International Building Products, Inc.*, "CERCLA prevents individuals from hiding behind the corporate shield when, as 'operators,' they themselves actually participate in the wrongful conduct . . . ."[32] This is a logical approach.

■ The question of whether Leven exerted sufficient control over the LIDCO site to become individually liable under the MTCA requires a fact-specific analysis. Unigard

---

[28]*Levin Metals Corp. v. Parr-Richmond Terminal Co.*, 781 F. Supp. 1454, 1456 (N.D. Cal. 1991).

[29]*Id.* at 1456. *See also United States v. Gurley*, 43 F.3d 1188 (8th Cir. 1994), *cert. denied*, 516 U.S. 817 (1995). Some courts have adopted a "prevention test" and held that authority to control, whether or not it was actually exercised, is the relevant issue. In *United States v. Carolina Transformer Co.*, 739 F. Supp. 1030, 1037 (E.D.N.C. 1989), *aff'd*, 978 F.2d 832 (4th Cir. 1992), the Fourth Circuit affirmed a North Carolina district court ruling which set forth the following factors as relevant in the officer-liability analysis: sizeable stock ownership in the corporation, active participation in the management of the corporation, presence at and supervision of the operation of the facility, founded the company, capacity and general responsibility to control the disposal of hazardous waste at the facility, power to direct negotiations concerning the disposal of wastes, and capacity to prevent and abate the damage caused by the disposal of hazardous wastes. Courts have criticized this holding for its imposition of liability on officers simply by virtue of their ability to control, not actual control. We decline to adopt this standard because it may be used to impose liability on those who had no knowledge of or ability to control activities at the site.

[30]524 U.S. 51, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998).

[31]*Id.* at 66-67.

[32]931 F.2d 327, 330 (5th Cir.), *cert. denied*, 502 U.S. 1004 (1991).

claims that Leven "personally never operated or exercised any control over the site," while Leven asserts that he was the "president, director, and sole shareholder of the corporation (consisting of less than five employees) actually engaged in the activities allegedly causing contamination." These differences of opinion are understandable given Leven's own contradictory statements. Leven stated in an August 1996 answer to an interrogatory that he "had no 'operations or involvement' at the [LIDCO] site and has no current or former employees with personal knowledge of Bayside d/b/a LIDCO's 'operations or involvement' at the site." And in a July 1997 deposition, he testified that he had never been to this "mystery property" until April 1997 and that he had no direct knowledge of what was happening at the LIDCO site when Bayside operated there. He identified William Snyder as the person "responsible for being aware of what was happening at the LIDCO property during the period of operation by Bayside." In an October 9, 1997 affidavit, however, Leven explained the situation differently:

> As the owner and sole shareholder of Bayside Waste Hauling & Transfer, I controlled the management of and oversaw all operations of the company. I was in charge of and was directly responsible for all of Bayside Waste Hauling & Transfer d/b/a LIDCO's operations at the Bayside-Standard Equipment site, and had sole and absolute authority to control all the activities of Bayside Waste Hauling & Transfer employees who performed any work at the site.
>
> I had control over all decision-making functions related to the operations of Bayside . . . I appointed William Snyder to manage the operations of Bayside Waste Hauling & Transfer d/b/a LIDCO at the Bayside-Standard Equipment site, and Mr. Snyder reported directly to me regarding any issues that affected the day-to-day operations at the site. No operations conducted by Bayside Waste Hauling & Transfer d/b/a LIDCO took place at the Bayside-Standard Equipment site without my knowledge, consent, and approval.

Although Leven is attempting with these representations

to raise an issue of material fact about his participation at the LIDCO site, he may not retract his earlier sworn statements with a contradictory self-serving affidavit:

> When a party has given clear answers to unambiguous . . . questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.[33]

Thus, Unigard is correct that based on Leven's own attestations that he had no "operations or involvement" in the LIDCO site, Unigard should have been permitted to argue that he should not personally have incurred MTCA liability. Its inability to make this argument to DOE before Leven was designated a PLP resulted in prejudice. The trial court therefore erred in concluding that Unigard had a duty to defend Leven in the MTCA proceedings.

## Duty to Indemnify

The trial court ruled that Unigard must indemnify Leven for all reasonable remediation costs associated with the LIDCO site because "[w]hether Bruce Leven wore his personal hat, his indemnitor's hat, his insurance-follows-the-risk-hat, his fulfill-the-settlement-agreement-approved-by-Unigard hat, or a combination of those hats, *he* had to respond to DOE." We disagree with this premise. Because Leven and Bayside are separate and distinct entities, several of these "hats" may be worn only by Bayside.[34]

First, Leven could not have "retained" liability as a named insured because the Unigard policy states that Leven is covered only while acting within the scope of his duties as officer, director, or shareholder of Bayside, or as

---

[33]*Marshall v. AC&S Inc.*, 56 Wn. App. 181, 185, 782 P.2d 1107 (1989) (quoting *Van T. Junkins & Assoc., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)).

[34]The Standard Equipment settlement agreement, in particular, was entered into by Bayside, not Leven. Leven therefore has no personal obligations under the agreement and cannot point to it as a source of coverage.

the sole proprietor of a business. Leven does not argue that he was the sole proprietor of Bayside, and he has specifically disclaimed any officer liability by stating that he had no control or involvement in LIDCO site operations. In addition, when he signed the indemnification agreement in 1987, Leven had not yet been designated a PLP. Leven was not entitled to personal coverage under the policy.

What Leven actually did was to *assume*, in his personal capacity, Bayside's corporate obligation through his indemnification agreement with WMX. The Unigard policy specifically prohibits such an assumption. It states that an insured "shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense." In *Aetna Casualty & Surety Co. v. Dow Chemical Co.*,[35] the court observed that "by retaining legal liability for pre-existing environment damage in a contract where it sells its business," an insured does not " 'voluntarily' assume another's liability and thus coverage was not barred under the voluntary payment provision."[36] But because, as we have just explained, Leven had no coverage personally for the activities at the LIDCO site, he could not confer coverage on himself by agreement with WMX. Leven voluntarily entered into an agreement with WMX on his own behalf under which he personally received $40 million, a substantial financial benefit. While Unigard may be responsible for Bayside's corporate liability, Leven cannot convert that obligation to one covering him personally. Unigard has no obligation to provide coverage for Leven under an indemnification agreement which the policy terms specifically prohibited.

■ The only remaining basis for Leven to assert coverage is as the beneficiary of Bayside's coverage, which he asserts transferred to him by operation of law when he entered into the WMX agreement. Leven theorizes that "as the result of the 1987 Waste Management Agreement,

[35]10 F. Supp. 2d 771 (E.D. Mich. 1998).

[36]*Id.*

Leven retained responsibility for any liability arising out of the operations of Bayside and is entitled to all insurance coverage for any such claim." The trial court agreed that "as a general proposition, insurance follows the insured risk to the holder of the insured risk . . . ." Leven cites *B.S.B. Diversified Co. v. American Motorists Insurance Co.*[37] and *Northern Insurance Co. v. Allied Mutual Insurance Co.*[38] to support his argument that his agreement with WMX transferred Bayside's coverage to him by operation of law. We agree with Unigard that these cases do not sweep so broadly as to hold that coverage transfers by operation of law whenever a nonsuccessor voluntarily assumes an indemnity obligation.

In *Northern Insurance*, the Ninth Circuit concluded that, although there was no explicit transfer of liabilities in an asset purchase agreement in which Brown-Foreman Corporation purchased California Cooler, liability for pre-sale activity "transferred irrespective of any clauses to the contrary in the asset purchase agreement"[39] and the rights under California Cooler's insurance transferred with the liability by operation of law. In *B.S.B.*, the court "extend[ed] the holding in *Northern Insurance* to a successor responsible for environmental cleanup where the events creating liability occurred prior to transfer of liability."[40] The court concluded that an insurer's risk does not increase when its duty to indemnify and defend relates to events occurring prior to transfer.[41] It recognized that after a corporation is dissolved and its assets are transferred, causes of action against the corporation may still exist for which the corporation's predecessor may be liable. Because liability passes to a successor corporation as a matter of law, insur-

---

[37]947 F. Supp. 1476 (W.D. Wash. 1996).

[38]955 F.2d 1353 (9th Cir.), *cert. denied*, 505 U.S. 1221 (1992).

[39]*Id.* at 1357.

[40]947 F. Supp. at 1481.

[41]*Id.*

ance benefits must pass as well.[42] But this reasoning does not apply to Leven personally because WMX, not Leven, was the successor to Bayside. There is no reason to extend *Northern Insurance* and *B.S.B.* to nonsuccessors who voluntarily enter into partial indemnification agreements in exchange for substantial personal compensation. These cases offer no support for Leven's contention that Unigard's coverage transferred to him by operation of law.

## Attorney Fees

■ The trial court awarded Leven personally $939,000 in attorney fees under *Olympic Steamship Co. v. Centennial Insurance Co.*[43] as bad faith and/or Consumer Protection Act damages. *Olympic Steamship* provides that "[a]n insured who is compelled to assume the burden of legal action to obtain the benefit of its insurance contract is entitled to attorney fees . . . ."[44] If, however, an insured has "undisputedly failed to comply with express coverage terms,"[45] *Olympic Steamship* fees are not warranted. Leven's undisputed failure to inform Unigard of his PLP designation until seven years after the fact violated the Unigard policy and prevents the court from awarding him *Olympic Steamship* fees.

■ The trial court also found that Unigard exhibited bad faith in dealing with Leven's claim and awarded Leven fees under the Washington Consumer Protection Act (CPA). An insurance company violates the Washington CPA if it acts without reasonable justification in handling a claim by

---

[42]*See Quemetco, Inc. v. Pacific Auto. Ins. Co.*, 24 Cal. App. 4th 494, 29 Cal. Rptr. 2d 627 (1994).

[43]117 Wn.2d 37, 811 P.2d 673 (1991).

[44]*Id.* at 54; *see also McGreevy v. Oregon Mut. Ins. Co.*, 128 Wn.2d 26, 40, 904 P.2d 731 (1995).

[45]*P.U.D. No. 1 v. International Ins. Co.*, 124 Wn.2d 789, 815, 881 P.2d 1020 (1994).

its insured.[46] The trial court stated that Unigard could not justify its "long-term refusal" to provide coverage, particularly in light of (1) Unigard's "undisputed full and complete knowledge of [Leven's] roles as a Named Insured, as Bayside's designee under the settlement, as the indemnitor under WMX's purchase of Bayside, and as the true party in interest"; and (2) Unigard's failure to enumerate its reasons for denying coverage. As evidenced by the preceding analysis, Unigard did not know that Leven intended to assert a personal claim for coverage. When Leven finally did so seven years after the LIDCO site proceedings commenced, Unigard acted reasonably in contesting it.

Leven has failed to establish that he is entitled in his personal capacity to either defense or indemnification under the Unigard policy. Unigard acknowledges a possible obligation to indemnify Bayside for remediation of the LIDCO site, but Bayside's rights are not at issue here. The trial court erred in ignoring Bayside's corporate status and in treating Leven and Bayside as indistinguishable entities. We reverse the trial court's summary judgment ruling and fee awards, and direct entry of judgment for Unigard.

Reversed.

COLEMAN and BAKER, JJ., concur.

Review denied at 140 Wn.2d 1009 (2000).

---

[46]*Gingrich v. Unigard Sec. Ins. Co.*, 57 Wn. App. 424, 433, 788 P.2d 1096 (1990).