[No. 30915-7-II. Division Two. January 11, 2005.]

HOLLY MOUNTAIN RESOURCES, LTD., ET AL., *Respondents*, v. WESTPORT INSURANCE CORPORATION, *Petitioner*.

---

*Karen S. Weaver, Therese M. Hansen,* and *Gary A. Sparling* (of *Soha & Lang, P.S.*), for petitioner.

*Matthew B. Edwards* (of *Owens Davies, P.S.*), for respondents.

¶1 HUNT, J. — Westport Insurance Corporation (Westport) appeals the trial court's grant of partial summary judgment to its insured, Holly Mountain Resources, Ltd., arising from a breach of contract and timber trespass lawsuit that Ahtanum Irrigation District (AID) filed against Holly Mountain; John Zapel, its president; and his wife, Vickie Zapel (Holly Mountain). Westport argues the trial court erred in ruling that Westport, in bad faith, breached its duty to defend Holly Mountain, entitling Holly Mountain to coverage by estoppel, attorney fees, and the value of the counterclaim. Holding that Westport did not breach its duty to defend Holly Mountain because AID's complaint against Holly Mountain alleged only claims that the policy unambiguously did not cover, we reverse.

## FACTS

¶2 Holly Mountain Resources, Ltd., was a Washington corporation engaged in contract logging.[1] John Zapel was its president. Holly Mountain purchased comprehensive liability insurance from Westport Insurance Corporation.

### I. WESTPORT INSURANCE POLICY

¶3 Relevant excerpts from Holly Mountain's Commercial General Liability Coverage insurance policy with Westport included:

### SECTION I—COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

    **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

    . . . .

    **b.** This insurance applies to "bodily injury" and "property damage" only if:

    **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

    **(2)** The "bodily injury" or "property damage" occurs during the policy period.

    . . . .

2. **Exclusions**

    This insurance does not apply to:

---

[1] Holly Mountain ceased doing business in February 2003.

**a.  Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. . . .

**b.  Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

. . . .

**j.  Damage To Property**

"Property damage" to:

. . . .

**(5)**  That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations;

. . . .

**SECTION V—DEFINITIONS**

. . . .

13.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

17.  "Property damage" means:

**a.**  Physical injury to tangible property, including all resulting loss of use of that property . . .

**b.**  Loss of use of tangible property that is not physically injured.

Clerk's Papers (CP) at 89, 92, 98, 100, 101.

¶4 The policy also included a "Logging and Lumbering Operations Endorsement" that modified the Commercial General Liability Coverage Part. It provided:

With respect to "logging and lumbering operations" as defined below Section 1, Coverage A, "Property Damage" Liability, is amended to include:

. . . .

2. **"PROPERTY DAMAGE" TO TIMBERLAND NOT OWNED BY ANY NAMED INSURED**—Meaning, "property damage" to timberland and standing, felled or bucked timber at premises rented or controlled by the Named Insured, if such timberland or timber is not owned by any insured except while such timber is being transported; and

. . . .

4. **TIMBER TRESPASS**—Is defined as unexpected or unintended "property damage" to timberland or standing timber which is not owned by the Named Insured or in the care, custody or control of the Named Insured and which arises out of the "logging and lumbering operations" of the Named Insured.

CP at 106.

## II. Holly Mountain's Breach of AID Timber Harvest Contract

¶5 In January 1998, Holly Mountain entered into a "Timber Harvest Agreement" (the Contract) with AID. The Contract gave Holly Mountain the right to log AID's land, as directed, for a three-year period. The Contract provided that Holly Mountain was to harvest certain volumes of timber with the objective of enhancing snowpack retention, thinning for improved stand growth, and removing overstory. The Contract specifically proscribed nonharvest areas, timing, and various other logistics. The Contract further provided that in logging the AID property, Holly Mountain would emphasize market timing to maximize potential returns to AID.

¶6 Holly Mountain logged the AID land for approximately two years, until late in 1999, when AID asked Holly Mountain to produce an accounting of its logging costs and gross mill receipts. When Holly Mountain refused, AID ordered Holly Mountain off its land and to discontinue harvesting.

¶7 In November 1999, AID sued Holly Mountain and president Zapel for the following breaches of the timber

harvest contract. Holly Mountain and Zapel (1) failed to harvest the timber in a timely manner, (2) failed to enhance snowpack retention, (3) failed to minimize postharvest erosion, (4) failed to conform to the laws of Washington,[2] (5) failed to maintain roads, (6) failed to perform cleanup, and (7) failed to haul cut logs to the mill. AID's complaint further alleged that Holly Mountain failed to produce logging cost documentation as AID had requested.

¶8 In addition, AID's complaint alleged that Holly Mountain breached the Contract by committing intentional timber trespass as follows:

> Holly Mountain and John P. Zapel harvested timber in violation of the Agreement. They had no right to harvest trees except as described in the Agreement and the sustained harvest plans pursuant to that Agreement. Any harvest of trees outside the scope of the management plan in any year was a timber trespass under RCW 4.24.630 or under RCW 64.12.030. These acts of Holly Mountain and John P. Zapel were intentional. Holly Mountain's and John P. Zapel's acts of timber trespass by cutting timber not allowed under the Agreement has damaged the Ahtanum Irrigation District in an amount to be proved at the time of trial but known to exceed $35,000.00.

CP at 231-32.

### III. HOLLY MOUNTAIN'S DEFENSE OF AID LAWSUIT BY INDEPENDENT COUNSEL

### A. Westport's Rejection of Holly Mountain's Tender of Defense

¶9 Acting on Holly Mountain's behalf, Zapel forwarded AID's complaint to Westport for defense under Holly Mountain's insurance policy. On December 27, 1999, Westport sent Holly Mountain a letter denying that it had any obligation to provide a defense for Holly Mountain. Westport's letter stated in part:

---

[2] The complaint did not specify which laws Holly Mountain failed to follow.

Based on our review of the allegations contained within the above referenced complaint, it is our opinion that there is no allegation of an "occurrence," "bodily injury" or "property damage" as defined in the policy. In addition, it appears that exclusions "a" and "b" may be applicable to exclude coverage as your policy does not provide coverage for intentional acts.

You are hereby notified that it is our opinion that we owe no duty to either defend or indemnify you for the allegations contained within this complaint, and we strongly recommend that you obtain personal counsel to protect your interests in this matter. However, should an amended complaint be filed in this matter, please immediately forward the complaint for our review for potential coverage.

. . . .

In addition, if you have any information which you feel would change our opinion on coverage and/or duty to defend, please immediately forward the documentation to us for review.

CP at 236-37.

¶10 On January 3, 2000, Linda Adams, a senior claims representative for Westport, spoke with Zapel on the telephone. Zapel had not yet received Westport's letter disclaiming coverage. They discussed the reasons behind Westport's denial of coverage and duty to defend. Zapel admitted that he did not believe there would be insurance coverage for the lawsuit. According to Adams, Zapel "responded that he . . . would call with any questions once he received the disclaimer letter." CP at 811. Zapel did not call.

¶11 On January 6, 2000, Adams reviewed a copy of the AID-Holly Mountain Timber Harvest Agreement, but it did not change her decision to decline coverage by Westport. On February 25, 2000, after hearing nothing further from Zapel or Holly Mountain, Westport closed the claim file. Holly Mountain made no further communications to Westport about its claim for almost two years.

## B. Holly Mountain's Hiring of Independent Counsel to Defend AID Lawsuit

¶12 After Westport's rejection of Holly Mountain's tender of defense, Holly Mountain retained independent counsel, who filed an answer to AID's complaint and a counterclaim against AID for lost profits it suffered when AID terminated Holly Mountain's logging rights, allegedly in breach of the parties' logging Contract.

¶13 In April 2001, AID answered Holly Mountain's first set of interrogatories. In October 2001, AID answered Holly Mountain's second set of interrogatories. In the second set of answers, AID alleged primarily breaches of contract and economic losses, including the following answer to interrogatory 5:

> Additionally, snowpack retention in Section 13 North of the road was over cut. Section 3 was almost a clear-cut. To date, there is no reproduction present in Section 3, despite the fact that it was harvested over 3 years ago. There was very little if any return to AID. All revenue was applied by Mr. Zapel to alleged logging costs and overhead. Due to the over cutting, significant erosion is occurring on the east side of Section 3. Additionally, [Holly Mountain] did not leave a wide enough buffer on the portion of Section 13 which was logged by helicopter. This has caused significant wind damage and blow down.

CP at 243-44.

¶14 Later in October, AID answered a third set of interrogatories. The answer to interrogatory 3 stated:

> [Holly Mountain] failed to maintain roads in a manner required by the Forest Practice Rules. [Holly Mountain]'s failure to maintain the surface of the A-3000 road caused loss of gravel into the ditches and to the fill slope. Additionally, operations on part of the road continued when the road was bare of gravel down to the ballast. Additionally, in Sections 3 and 9, [Holly Mountain]'s failure to maintain the road system resulted in blocked pipes and other problems which caused sediment to enter type 4 and type 5 streams which flow directly into the North Fork Ahtanum Creek.

CP at 248.

## IV. Holly Mountain's Second Tender of Defense to Westport

¶15 On October 29, 2001, Holly Mountain's independent counsel again requested that Westport defend Holly Mountain against AID's lawsuit. On January 29, 2002, Westport declined to reconsider its refusal to defend Holly Mountain, stating, "Your most recent correspondence does not contain anything new in terms of facts, allegations or specific pleadings that would alter the reasoning outlined in the coverage disclaimer of December 27, 1999."[3] CP at 275.

¶16 In February 2002, Holly Mountain wrote Westport that, in answering interrogatories, AID had made it clear that it was seeking recovery for "property damage" allegedly caused by Holly Mountain. Holly Mountain included quotes from the second and third interrogatories, copies of which Westport did not have, and asserted its Westport policy covered this claim.

¶17 From February to May 2002, Westport communicated with Holly Mountain's independent counsel and AID. On March 14, 2002, correspondence from AID to Westport mentioned, for the first time, that AID might seek recovery for negligent timber trespass: "Discovery has indicated that those trees *may* have been taken as a result of *Holly Mountain's negligence or recklessness.*" CP at 736 (emphasis added).

¶18 On March 15, 2002, the Zapels filed a motion for summary judgment, asking the trial court to dismiss the claims against them individually. The court granted the motion in part, dismissing all claims except those for timber trespass and commingling funds. Holly Mountain sent Westport a short letter explaining the court's dismissal of all but two claims, together with copies of the pleadings and the summary judgment order.

---

[3] Westport states that Holly Mountain's October 29, 2001 letter did *not* contain any answers to interrogatories and Westport was, therefore, not advised of any new allegations of property damage. The record shows that answers to only the first set of interrogatories were mailed to Westport on December 5, 2001. Westport never received answers to the second and third sets of interrogatories.

¶19 In early May 2002, Holly Mountain's independent counsel learned that Westport was discussing settlement terms with AID and asked Westport to stop communicating with AID. Westport ceased communication with AID.

### V. HOLLY MOUNTAIN'S LAWSUIT AGAINST WESTPORT

¶20 On May 20, 2002, Holly Mountain sued Westport for breach of insurance contract, acting in bad faith, and violating the Consumer Protection Act, chapter 19.86 RCW. On July 19, 2002, Westport notified Holly Mountain that, in light of the "newly-alleged" timber trespass and property damage claims, it would provide Holly Mountain a defense in the AID lawsuit under a reservation of rights for certain claims.

¶21 After hearing nothing further from Westport for several months, in October Holly Mountain's independent counsel sent Westport two letters inquiring about the defense. On November 1, 2002, Westport advised Holly Mountain that it had hired Jim Berg to defend Holly Mountain against AID.

¶22 In February 2003, Holly Mountain moved for summary judgment in its lawsuit against Westport. In March 2003, Westport filed a reply, in which Westport moved for summary judgment against Holly Mountain. Ruling that Westport had breached its duty to defend and acted in bad faith as a matter of law, the trial court granted Holly Mountain's motion for partial summary judgment and denied Westport's cross-motion for summary judgment.

¶23 Holly Mountain moved for attorney fees and an order that Westport was estopped from denying coverage for any AID claim against Holly Mountain, whether or not the policy would have provided coverage. The trial court granted this motion, too.

¶24 Holly Mountain also asked the trial court to hold Westport liable for the full, good faith value of its counterclaim against AID for lost profits resulting from AID's cancellation of Holly Mountain's timber harvest Contract.

Ruling that Westport was liable for the full value of Holly Mountain's counterclaim, the trial court entered a $342,224.75 judgment against Westport under CR 54(b).

¶25 Westport appeals.

## ANALYSIS

¶26 In granting summary judgment for Holly Mountain, the trial court ruled that Westport breached its duty to defend Holly Mountain against AID's lawsuit and acted in bad faith. In so doing, the trial court erred as a matter of law. Reviewing this case de novo and considering all facts in the light most favorable to the nonmoving party, we hold that Westport properly denied Holly Mountain's request to defend because the allegations in AID's complaint were clearly outside the insurance policy's coverage.

### I. Standard of Review

¶27 When reviewing an order of summary judgment, we engage in the same inquiry as the trial court. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). We consider all facts submitted and all reasonable inferences from them in the light most favorable to the nonmoving party. *Wilson*, 98 Wn.2d at 437. The nonmoving party may not rely on speculation, argumentative assertions that unresolved factual issues remain, or having its affidavits considered at face value. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986).

¶28 After the moving party has submitted adequate affidavits, the burden shifts to the nonmoving party to set forth specific facts sufficiently rebutting the moving party's contentions and disclosing the existence of a material issue of fact. *Seven Gables*, 106 Wn.2d at 13. We will uphold the trial court's grant of summary judgment only if, from all the

evidence, reasonable persons could reach but one conclusion. *Wilson*, 98 Wn.2d at 437. We hold that Westport has met its burden here.

## II. WESTPORT'S REJECTION OF HOLLY MOUNTAIN'S DEFENSE

¶29 Westport argues the trial court erred in ruling that, as a matter of law, Westport acted in bad faith and breached its duty to defend Holly Mountain against AID's lawsuit. We agree.

### A. Duty to Defend

■■ ¶30 An insurer's duty to defend arises when an action is first brought, and it is based on the potential for liability. *Truck Ins. Exch. v. VanPort Homes, Inc.*, 147 Wn.2d 751, 760, 58 P.3d 276 (2002). An insurer has a duty to defend " 'when a complaint against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured within the policy's coverage.' " *Truck*, 147 Wn.2d at 760 (quoting *Unigard Ins. Co. v. Leven*, 97 Wn. App. 417, 425, 983 P.2d 1155 (1999), *review denied*, 140 Wn.2d 1009 (2000)). If the complaint is ambiguous, insurers should construe it liberally, in favor of the insured. *Truck*, 147 Wn.2d at 760. Conversely, if the alleged claims are clearly outside the policy's coverage, then the insurer has no duty to defend. *Truck*, 147 Wn.2d at 760.

¶31 Two exceptions to the general rule of referencing only the complaint favor the insured. *Truck*, 147 Wn.2d at 761. First, if coverage is not clear from the face of the complaint but may nonetheless exist, the insurer must investigate the claim and give the insured the benefit of the doubt in determining whether the insurer has a duty to defend. *Truck*, 147 Wn.2d at 761. Second, the insurer may consider facts outside the complaint if " ' "(a) the allegations are in conflict with facts known to or readily ascertainable by the insurer or (b) the allegations of the complaint are ambiguous or inadequate." ' " *Truck*, 147 Wn.2d at 761 (quoting *Atl. Mut. Ins. Co. v. Rolfe, Inc.*, 73 Wn. App. 858,

862, 872 P.2d 536 (1994) (quoting *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wn.2d 901, 908, 726 P.2d 439 (1986))). Neither exception applies here, however, because it is clear from the face of AID's complaint against Holly Mountain that there was no coverage under the Westport insurance policy.

¶32 Holly Mountain tendered AID's November 1999 complaint to Westport and asked Westport to provide a defense. AID's complaint alleged that Holly Mountain committed fraud, misrepresentation, and breach of contract, including *intentional* timber trespass in breach of contract. Specifically, AID alleged that Holly Mountain breached its timber harvest Contract when it (1) failed to harvest timber timely, (2) failed to enhance snowpack retention and to minimize postharvest erosion, (3) failed to conform to the laws of Washington, (4) failed to maintain roads and to perform cleanup, (5) failed to haul cut logs to the mill, (6) failed to produce documentation of logging costs, and (7) committed intentional timber trespass on AID land by cutting unauthorized timber outside the agreed timber harvest plan.

¶33 Westport's insurance policy specifically excluded from coverage contractual liability and expected or intended injuries. AID's complaint unambiguously alleged breaches of contract and intentional torts by Holly Mountain.[4] It alleged no covered "occurrence" (accident) or "property damage" as defined under Holly Mountain's Westport

---

[4] For example, the complaint's "FACTS" section II, paragraph three, alleged multiple breaches of contract. Similarly, the complaint's "CLAIM OF DAMAGES" section III, paragraph one, alleged damages from the "material breaches of contract" "complained of above." Even paragraph three of this section's sole reference to "timber trespass" is characterized as "intentional" "cutting [of] timber not allowed under the Agreement" because Holly Mountain had "no right to harvest trees except as described in the Agreement and the sustained harvest plans pursuant to that Agreement." CP at 25-26.

Moreover, the complaint's "PRAYER FOR RELIEF," section IV, paragraph one, asked for a judgment against Holly Mountain and Zapel for "breach of contract and/or fraud." (The fraud allegation related to Holly Mountain's allegedly having dissolved as a corporation before entering into the AID Contract, thereby defrauding AID.) And paragraph 2 requested treble damages for the intentional, breach-of-contract timber trespass.

insurance policy.[5] Rather, the damage it alleged arose exclusively from Holly Mountain's alleged breach of contract, which the policy did not cover.

¶34 Because AID's claims were clearly outside Holly Mountain's policy coverage, Westport had no duty to investigate or to look outside the complaint for additional information.[6] Nonetheless, Adams did review the Timber Har-

---

[5] In its December 27, 1999 rejection of Holly Mountain's request, Westport responded that it had no duty to defend Holly Mountain on the allegations contained in the AID complaint. The letter summarized and quoted the following pertinent language from the insurance policy:

[T]his insurance applies only to "bodily injury" and "property damage" which occurs during the policy period and is caused by an "occurrence."

"Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

CP at 235-36. The letter also included the policy definitions of "bodily injury" and "property damage." Westport further noted that although the policy covered timber trespass, the policy defined "timber trespass" as

*unexpected* or *unintended* "property damage" to timberland or standing timber which is not owned by the named insured or in the care, custody or control of the named insured and which arises out of the logging and lumber operations of the named insured.

CP at 236 (emphasis added). Westport further noted that the policy contained "exclusions" for "a. expected or intended injury" and "b. contractual liability."

Westport's letter concluded:

Based on our review of the allegations contained within the above referenced complaint, it is our opinion that there is no allegation of an "occurrence," "bodily injury" or "property damage" as defined in the policy. In addition, it appears that exclusions "a" [expected or intended injury] and "b" [contractual liability] may be applicable to exclude coverage as *your policy does not provide coverage for intentional acts*.

You are hereby notified that it is our opinion that we owe no duty to either defend or indemnify you for the allegations contained within this complaint. . . . However, should an amended complaint be filed in this matter, please immediately forward the complaint for our review for potential coverage.

You are also hereby notified that we are undertaking the investigation of this matter under a full reservation of rights.

. . . .

In addition, if you have any information which you feel would change our opinion on coverage and/or duty to defend, please immediately forward the documentation to us for review.

CP at 236-37 (emphasis added).

[6] Westport did, however, offer to consider any amended complaint or any additional information that Holly Mountain could provide which might affect Westport's coverage decision and duty to defend. But Holly Mountain failed to

vest Agreement, but it did not change her decision to decline coverage. Even Holly Mountain's principal, Zapel, told Westport that he had not expected the AID complaint to fall within Westport's policy coverage.

## B. Bad Faith

¶35 An insurer may be liable in damages for the tort of bad faith[7] if it fails to follow the terms of its insurance contract. *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 393-94, 823 P.2d 499 (1992). In order to establish bad faith, an insured must show the insurer committed a breach that was unreasonable, frivolous, or unfounded. *Kirk v. Mt. Airy Ins. Co.*, 134 Wn.2d 558, 560, 951 P.2d 1124 (1998). The insured does not establish bad faith, however, when, as here, the insurer denies coverage or fails to provide a defense based upon a reasonable interpretation of the insurance policy. *Kirk*, 134 Wn.2d at 560 (citing *Transcon. Ins. Co. v. Wash. Pub. Util. Dists.' Util. Sys.*, 111 Wn.2d 452, 470, 760 P.2d 337 (1988)). If the insured fails to show the insurer acted in bad faith, then there is no presumption of harm or coverage by estoppel.

¶36 Holly Mountain argues that *Truck*, 147 Wn.2d 751, is controlling. But *Truck* is factually distinguishable. VanPort, Truck's insured, was a construction company sued by several of its customers for violations of the Consumer Protection Act, the Consumer Credit Protection Act, misrepresentation, usury, breach of contract, and negligence. *Truck*, 147 Wn.2d at 756. VanPort tendered the lawsuits to

---

supply additional information to Westport for nearly two years, and Westport closed its claim file.

[7] A cause of action for bad faith acknowledges that the business of insurance affects the public interest and that an insurer has a duty to act in good faith. *See Kirk v. Mt. Airy Ins. Co.*, 134 Wn.2d 558, 560, 951 P.2d 1124 (1998). RCW 48-.01.030 provides:

> The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance.

Truck, which denied coverage approximately one year later. *Truck*, 147 Wn.2d at 757. The Supreme Court held that Truck had denied coverage in bad faith. Although Truck's letter denying coverage quoted extensively from the policy language, the letter (1) provided no analysis or explanation of how the policy language excluded VanPort's claim and (2) falsely stated the insurer had conducted a thorough investigation. *Truck*, 147 Wn.2d at 757. When VanPort requested a meeting with the insurer to discuss the denial, Truck never responded. *Truck*, 147 Wn.2d at 757. In fact, Truck did not explain its denial of coverage until nearly two years later when it filed for declaratory judgment. *Truck*, 147 Wn.2d at 757. None of these facts used by the court to find bad faith in *Truck* are present here. Therefore, *Truck* does not control.

¶37 Here, in contrast, Westport demonstrated good faith. First, Westport went beyond the confines of the insurance policy and reviewed Holly Mountain's timber harvest Contract with AID before finally concluding that AID's complaint alleged noncovered breach of contract actions. Second, Westport spoke with Zapel on the telephone and explained why Westport was denying coverage. Third, Westport's letter to Holly Mountain denying coverage (1) explained the reasons for the denial, citing the pertinent policy language and (2) offered to reconsider its decision if Holly Mountain provided additional pleadings or information, which Holly Mountain failed to provide for nearly two years. Moreover, Westport's rejection of Holly Mountain's tendered defense was consistent with Holly Mountain's expectation, exemplified by Zapel's admission that he did not expect the policy to cover the claim. And finally, after receiving notice of AID's allegation of potentially "negligent or reckless" timber trespass and other property damage, which Westport still deemed contractual in nature and outside the policy's coverage, Westport nev-

ertheless hired counsel to defend Holly Mountain under a reservation of rights.[8]

## C. Summary

¶38 Because Holly Mountain's initial tender of the AID complaint to Westport contained no covered claims, Westport did not breach its duty to defend. And because Westport had no duty to defend, as a matter of law, it did not act in bad faith in denying Holly Mountain's tender of its defense. We hold, therefore, that the trial court erred (1) in granting partial summary judgment to Holly Mountain and (2) in assessing damages under an estoppel theory against Westport to reimburse Holly Mountain for lost profits Holly Mountain had asserted in its counterclaim against AID for terminating the timber harvest.

### III. ATTORNEY FEES

¶39 Holly Mountain requests attorney fees under *Olympic Steamship Co. v. Centennial Insurance Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991). In *Olympic Steamship* the Supreme Court recognized an insured's right to recoup attorney fees it incurs when an insurer refuses to defend or to pay the justified action or claim of the insured. 117 Wn.2d at 52.

■ ¶40 But *Olympic Steamship* does not apply here. Our having held that Westport owed Holly Mountain no duty to defend against AID's lawsuit, Holly Mountain's action against Westport was not justified as a matter of law.

---

[8] Where an insurer is uncertain about whether it has a duty to defend in a particular case, it may defend under a reservation of rights, as Westport ultimately did here. *Truck*, 147 Wn.2d at 761. A reservation of rights is a means by which the insurer conditionally defends its insured, subject to potential reimbursement by the insured upon later discovery that there was no duty to defend. An insurer's defense of its insured under a reservation of rights avoids breaching its duty to defend while seeking to avoid waiver and estoppel allegations. *Truck*, 147 Wn.2d at 761.

Not having prevailed, Holly Mountain is not entitled to attorney fees under *Olympic Steamship*.

¶41 Reversed and remanded.

MORGAN, A.C.J., and ARMSTRONG, J., concur.