997 P.2d 972 (2000)
100 Wash.App. 546
NORTHWEST PROSTHETIC & ORTHOTIC CLINIC, INC., a Washington corporation, Appellant,
v.
CENTENNIAL INSURANCE COMPANY, a foreign corporation, Respondent.
No. 44254-6-I.
Court of Appeals of Washington, Division 1.
April 24, 2000.
*973 Timothy R. Gosselin, Burgess Fitzer Leighton & Phillips Ps, Tacoma, for Respondent.
Bryan Patrick Coluccio, Short & Cressman, Seattle, for Appellant.
BECKER, A.C.J.
An insured's breach of insurance policy provisions will not result in denial of coverage unless the breach caused actual prejudice. In this case, the insured settled a debatable defamation claim before the insurer had a meaningful opportunity to investigate it. We affirm a summary judgment order excusing the insurer from its obligation to provide coverage because the loss of the opportunity to investigate amounted to actual prejudice.
In reviewing a summary judgment order, this court evaluates the matter de novo, engaging in the same inquiry as the trial court. Kruse v. Hemp, 121 Wash.2d 715, 853 P.2d 1373 (1993). All facts and reasonable inferences are considered in the light most favorable to the non-moving party. Mountain Park Homeowners Assn., Inc. v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994). Summary judgment is proper if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. CR 56(c).
Northwest Prosthetic and Orthotic Clinic operated several successful clinics in the Puget Sound area. Fred Cato, Stephen Lund and David Osborne were equal shareholders. Each shareholder had an employment agreement with Northwest.
In January 1995, Lund and Osborne terminated Cato's employment on behalf of Northwest. Cato brought suit, alleging, among other claims, that Northwest breached a contract clause requiring reasonable cause for his termination.
After a status conference in March 1995, the court moved the trial date forward from July 1996 to July 10, 1995. On May 15, 1995, Cato moved to amend his complaint to add a claim of defamation. The defamation claim alleged that Osborne and Lund had harmed Cato by their remarks about him to Northwest employees and unspecified third parties. Northwest opposed amending the complaint and requested a trial continuance if the court granted the motion to amend. On May 25, the court granted the motion to amend. The court denied the continuance but extended the discovery cutoff date.
Counsel for Northwest became aware at some point that Northwest had a business insurance policy. Although Northwest did not have a copy of the policy, counsel knew that a typical business policy provides coverage for defamation, although not for breach of contract and the other claims initially asserted by Cato. Counsel sent a letter to the local insurance agent enclosing a copy of the amended complaint "which was recently filed in this matter." The letter, dated June 14, 1995, tendered the claim and defense of the lawsuit to the insurer. The letter did not include any information about the defamation claim, the status of the case, the impending trial date, or a settlement conference scheduled for June 27.
The agent transmitted the notice of the claim electronically to Centennial Insurance Company. Centennial received the notice on or about June 26 and assigned the claim to Jana Weber, a claims handler. On June *974 27, a paralegal working with Northwest's counsel telephoned Weber. The paralegal requested a copy of the policy from Weber, but did not mention the trial date of July 10 or the settlement conference scheduled for that very day.
On June 30, 1995, 10 days before trial was to begin, the parties signed a settlement agreement. Among the various provisions of the agreement, Northwest agreed to pay Cato $325,000, characterized as damages for Cato's personal injuries on account of defamation.
Meanwhile, Centennial was hiring lawyers to defend Northwest on the defamation claim. On July 18 Centennial's attorney sent a letter to Northwest, agreeing to defend under a reservation of rights. The same day, Centennial's attorney telephoned Northwest's attorney for information about the defamation claim and learned at that time that the case had settled almost three weeks earlier.
Northwest made a claim to Centennial for the $325,000 paid as defamation damages under the settlement. Centennial denied coverage based on Northwest's violation of policy provisions requiring notice, cooperation and consent to settle. Northwest sued Centennial for coverage. Both parties moved for summary judgment. The court granted Centennial's motion and dismissed Northwest's suit. Northwest appeals, and asks this court to hold that the right to coverage has been established as a matter of law, or alternatively to reinstate the complaint and remand for trial.
The insurance policy's notice provision requires the insured to notify Centennial "as soon as practicable" of an occurrence, claim, or lawsuit. The policy also requires the insured to cooperate with Centennial in the investigation, settlement or defense of the lawsuit. Additionally, the policy prohibits the insured from voluntarily making any payment, assuming any obligation or incurring any expense without Centennial's consent.
That Northwest breached these obligations is not seriously disputed. Northwest had notice of the potentially covered defamation claim at least by May 15, 1995. Northwest's letter notifying Centennial is dated June 14, 30 days later. Actual notice of the claim did not reach Centennial until June 26. Northwest's letter did not mention the impending trial date; did not ask for permission to settle; and gave no hint that time was short and the need for response urgent.
Northwest argues, however, that Centennial has not shown actual prejudice. Noncompliance with an insurance policy provision does not deprive the insured of the benefits of the policy unless the insurer demonstrates actual prejudice resulting from the insured's noncompliance. Oregon Auto. Ins. Co. v. Salzberg, 85 Wash.2d 372, 377, 535 P.2d 816 (1975). The burden of proof is on the insurer. Salzberg, 85 Wash.2d at 377, 535 P.2d 816. If insurers were allowed to avoid payment based on the insured's conduct even in the absence of prejudice, the public policy of risk spreading would be compromised and, in a sense, the insurer would receive a windfall. Salzberg, 85 Wash.2d at 376-77, 535 P.2d 816.
To establish actual prejudice, the insurer must demonstrate "some concrete detriment resulting from the delay which harms the insurer's preparation or presentation of defenses to coverage or liability." Canron v. Federal Insurance Company, 82 Wash.App. 480, 486, 918 P.2d 937 (1996), review denied, 131 Wash.2d 1002, 932 P.2d 643 (1997). Whether interference with the insurer's ability to evaluate and investigate a claim has caused actual prejudice is ordinarily an issue of fact. Tran v. State Farm Fire & Cas. Co., 136 Wash.2d 214, 228, 961 P.2d 358 (1998). Nevertheless, our courts have found summary judgment to be appropriate in several cases where the insured's breach of a notice or cooperation clause prevented the insurer from conducting a meaningful investigation of a claim or presenting a viable defense to a claim. See, e.g. Tran, 136 Wash.2d at 231, 961 P.2d 358; Unigard Ins. Co. v. Leven, 97 Wash.App. 417, 435, 983 P.2d 1155 (1999); Pilgrim v. State Farm Fire & Cas., 89 Wash. App. 712, 725, 950 P.2d 479 (1997); Felice v. St. Paul Fire and Marine Insurance Co., 42 Wash.App. 352, 360, 711 P.2d 1066 (1985), review denied, 105 Wash.2d 1014 (1986).
*975 Northwest argues that Centennial has failed to offer concrete evidence of actual prejudice. Northwest relies on Canron, where this court reviewed a judgment entered in favor of an insurer, and reversed it upon finding that the insurer had failed to prove actual prejudice caused by late notice. Canron, a corporation, learned from the Environmental Protection Agency that it was a potentially responsible party in relation to the cleanup of a contaminated disposal site. Canron waited a full year before notifying its insurer, Federal, of this potentially covered claim. At the time Federal received notice from Canron, the EPA had not yet filed suit and in fact did not do so for another three months. Yet, Federal conducted no investigation. Canron sued Federal for indemnification. Federal's defense was that the year's delay by Canron automatically prejudiced Federal's ability to conduct a prompt investigation. Canron, 82 Wash.App. at 490, 918 P.2d 937. Although Federal identified possible detriments resulting from Canron's delay, it presented "no evidence of specifics and no evidence of resulting actual harm." Canron, 82 Wash.App. at 488, 918 P.2d 937. We held that the evidence was insufficient to support the jury's finding that Canron's delay had actually prejudiced Federal.
Northwest does not benefit from the holding in Canron because Centennial, unlike Federal, had no opportunity whatsoever to investigate, prepare a defense, and conduct the defense through its own choice of counsel. When Federal received notice of Canron's claim, litigation had not begun, so there was still ample time to investigate. When Centennial received notice of Northwest's claim, litigation had ended. In Canron, extensive documentation of investigation done by the EPA, the Department of Ecology and the other potentially responsible parties was available to the insurer. Here, there is no comparable record documenting the value of Cato's defamation claim. Several persons testified, when deposed by Cato, that they had heard certain remarks critical of Cato coming from the other shareholders. But there is no evidence establishing how, or to what extent, this information was likely to damage Cato's business interests or his emotional health. It does not appear that Northwest availed itself of the extended discovery period to depose Cato or any other witness about the defamation claim.
Northwest argues that actual prejudice has not been established because there is no evidence that Cato's defamation claim would have had a different outcome if Centennial had participated in Northwest's defense. This argument was rejected in Sears, Roebuck & Co. v. Hartford Accident & Indemnity Co., 50 Wash.2d 443, 454, 313 P.2d 347 (1957). The Sears Roebuck Company, self-insured, defended itself in a case arising from a slip and fall in the parking lot of its downtown Seattle store. A week before trial, Sears discovered that it was an additional insured under a Hartford policy issued to one of its licensees who operated a refreshment stand in the parking lot. Immediately upon learning of the policy, Sears' counsel notified Hartford of the pending action. Sears settled with the plaintiff on the third day of trial and then brought an action against Hartford to recover the amounts paid in settlement and defense.
The trial court entered judgment for Hartford after concluding that the delay must be regarded as prejudicial to Hartford. The trial court stated that "the mere fact that, if they had been handling it, they might have reached the very same result that was reached, is really no defense." Sears, 50 Wash.2d at 453, 313 P.2d 347. Affirming, the Supreme Court agreed with the trial court's view and held that Hartford had a right to investigate, prepare and defend through its own counsel. "To be deprived of that right constitutes prejudice, however imponderable the damages, and however efficient and competent the attorneys retained by the insured." Sears, 50 Wash.2d at 454, 313 P.2d 347.
Northwest suggests that Sears is no longer a viable precedent in light of the actual prejudice requirement in Oregon Auto Ins. v. Salzberg. But numerous cases after Salzberg have relied on Sears for the principle that actual prejudice may be decided as a matter of law without proof that timely notice to the insurer would have produced a different outcome. See, e.g., Pederson's *976 Fryer Farms, Inc. v. Transamerica Ins. Co., 83 Wash.App. 432, 438, 922 P.2d 126 (1996), review denied, 131 Wash.2d 1010, 932 P.2d 1255 (1997); Felice, 42 Wash.App. at 359-60, 711 P.2d 1066; Twin City Fire Ins. Co. v. King County, 749 F.Supp. 230, 233-34, (W.D.Wash.1990), affirmed, 942 F.2d 794 (1991)(applying Washington law). What is critical is for the insurer to show that it lost the opportunity to conduct a meaningful evaluation of its own. In Felice, the insurer did not receive notification until after a judgment was entered, and the court held that this delay "prejudiced the company because it was precluded from investigating and evaluating the case". Felice, 42 Wash.App. at 360, 711 P.2d 1066. Here, similarly, the belated notice deprived Centennial of the ability to conduct any investigation at all before Northwest committed $325,000 to obtain release from Cato's defamation claim.
Northwest contends that Centennial is estopped from asserting prejudice because, once it did become aware of the claim, it did not conduct an investigation before denying coverage. In a deposition taken by Northwest, Centennial's representative was unable to name specific witnesses, documents, or other evidence that had become lost or unavailable as a result of the delayed notice, and could not say how the attorneys hired by Centennial would have handled the Cato lawsuit differently from Northwest's lawyers. Northwest argues that Centennial's failure to identify such concrete detriments through a post-settlement investigation operates as a waiver of any claim of actual prejudice. We disagree. The settlement agreement between Cato and Northwest was signed just days after Centennial became aware of the claim. Once the defamation claim settled, meaningful investigation by Centennial would have been next to impossible. Outside of litigation, the insurer has no tools of discovery. Medical and business records are unobtainable. Witnesses cannot be put under oath. The mootness of the settled claim dulls the memory and motivation of those who were involved in it. The loss of a meaningful opportunity to investigate a debatable claim before it is settled is, by itself, a sufficiently concrete detriment to establish actual prejudice. As Sears demonstrates, an insurer's obligation to prove actual prejudice does not include conducting a post-settlement investigation or offering proof that the insurer would have achieved a better result.
There are circumstances where failing to notify an insurer of litigation will not amount to actual prejudice as a matter of law because the litigation achieved a clear cut result that is essentially beyond dispute. Such were the circumstances in Pulse v. Northwest Farm Bureau, Ins., 18 Wash.App. 59, 566 P.2d 577 (1977), review denied, 89 Wash.2d 1011. There, the Pulses hired their own counsel to defend them against a complaint that their cattle had broken through a neighbor's fence and damaged a miniature golf course. A bench trial resulted in a verdict for damages of $2,953.79, and judgment was entered upon a stipulation for a somewhat reduced amount. Only then did the Pulses discover they had insurance coverage. The insurer refused to pay the judgment. The trial court granted summary judgment for the insurer because of the Pulses' failure to give notice and their breach of the cooperation clause. This court, concluding that actual prejudice had not been established as a matter of law, reversed and remanded for a trial.
Significant factual differences prevent the result in Pulse from controlling the present case. The concrete damages to the miniature golf course in Pulse were easier to ascertain than the nebulous damages allegedly caused by Northwest's defamation of Cato. In Pulse, the underlying action was tried to a neutral decision-maker, and the insurer conceded it was highly questionable whether the insurer "could have been more persuasive than the plaintiffs' counsel in keeping the amount of the damages down." Pulse, 18 Wash.App. at 61, 566 P.2d 577. Here, there was no neutral decision-maker. The case ended with a settlement achieved by parties who shared an interest in characterizing the $325,000 payment as defamation damages rather than lost wages. Cato's salary was $25,000 a month at the time of his termination. After five months of unemployment, he had a claim for at least $125,000 in lost wages when the case settled. The Centennial *977 policy provides coverage for defamation, but does not cover Northwest for damages arising out of a contractual agreement, or a wrongful discharge, such as lost wages. To maximize the possibility of coverage, it was in Northwest's interest to ignore the lost wages and pay damages only for defamation. And it was in Cato's interest to characterize the entire $325,000 payment as defamation damages to avoid tax liability on the payment. Under these circumstances, unlike Pulse, one cannot be confident that the litigation accurately established the value of the claim.
Finally, we reject Northwest's efforts to portray itself as a victim of bad faith on the part of Centennial. Northwest settled the claim before Centennial had an opportunity to be guilty of bad faith. Nor do we see any merit to Northwest's arguments that Centennial did not promptly respond to the claim and provide coverage information. Given the untimely notice, nothing Centennial could have done would have increased its opportunity to investigate the claim.
Affirmed.
GROSSE, J., and ELLINGTON, J., concur.