**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERT I. GOODSTEIN, as court-
appointed receiver for Sternco
Industrial Properties Partnership
and Sterno Renton Center
Partnership,
        *Plaintiff-Appellant,*

        v.

CONTINENTAL CASUALTY COMPANY,
                *Defendant,*

        and

INDUSTRIAL INDEMNITY COMPANY;
INDUSTRIAL INDEMNITY CO. OF THE
NORTHWEST, also known as
Fremont Industrial Indemnity;
UNITED STATES FIRE INSURANCE
COMPANY; JOHN DOE, 1-20; ZELMAN
RENTON LLC,
        *Defendants-Appellees.*

No. 05-35805

D.C. No.
CV-02-01669-MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
March 6, 2007—Seattle, Washington

Filed December 3, 2007

Before: Diarmuid F. O'Scannlain, A. Wallace Tashima, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

15567

## COUNSEL

William F. Cronin, Corr Cronin Michelson Baumgardner & Preece LLP, and Colleen A. Christensen, The Christensen Firm, Seattle, Washington, for the appellant.

David M. Schoeggl, Mills Meyers Swartling, Seattle, Washington, for the appellees.

## OPINION

BERZON, Circuit Judge:

At the heart of this insurance coverage dispute lie two properties, identified as contaminated by the State of Washington, that were sold in their polluted state rather than remediated. After the sale, Appellant Robert I. Goodstein, as receiver, tendered a $5.3 million claim to Appellee Industrial Indemnity Co. ("Industrial") under a comprehensive general liability ("CGL") policy, reflecting the difference between "the appraised value of the sites if uncontaminated less the sales price of the sites in their contaminated states." Industrial refused to pay, and Goodstein consequently brought this lawsuit,[1] seeking a declaration that Industrial owed a duty to

---

[1]Appellee United States Fire Insurance Co. is also a defendant in this suit, as it agreed to satisfy the obligations of Industrial under the insurance policies at issue here.

indemnify and defend Goodstein under the policy and damages for breach of both duties. The district court granted summary judgment for Industrial on all claims, and Goodstein timely appealed.

We affirm the district court's holding that Goodstein's claim for the diminution in the sale value of the properties due to pollution was not covered under Industrial's policy, but reverse the district court's conclusion that Industrial is as a matter of law not liable for breaching its duty to defend Goodstein.

## I.

### A.  *The Properties*

Members of the Sternoff family jointly owned, through partnerships, two industrial properties in Washington (collectively, "the properties") — one on Marginal Way in Seattle ("the Marginal property") and the other in Renton ("the Renton property"). At the Marginal property, the Sternoffs operated for 45 years a scrap metal salvage yard that caused ground pollution. At the Renton site, the Sternoffs recycled scrap metal and electrical equipment for approximately 20 years, resulting in hazardous waste byproducts containing high concentrations of soluble lead. The properties were identified by the Washington State Department of Ecology ("DOE") as environmentally contaminated in the late 1980s and early 1990s and were listed as hazardous sites under the Model Toxics Control Act of Washington.[2]

---

[2]The Model Toxics Control Act of Washington, Wash. Rev. Code § 70.105D.040, "is designed to deal both with the remediation of former environmental hazards and to prevent environmental hazards in the future, [and] a past or present property owner is strictly liable for the remediation of environmental hazards caused by hazardous substances it released . . . on its property." *Olds-Olympic, Inc. v. Commercial Union Ins. Co.*, 918 P.2d 923, 927 (Wash. 1996).

Starting in the mid-1980s, the Sternoff partners had a series of disagreements among themselves that resulted in litigation. On March 29, 1990, the King County Superior Court dissolved the partnerships and appointed Robert Goodstein as receiver to wind them up. The court indicated that Goodstein "may proceed with remediation of contaminated properties as necessary but may also consider sale without remediation."

Recognizing the Sternoffs' liability for remediating the polluted properties under state and federal law,[3] Goodstein pre-

---

[3]Washington DOE regulations both allow voluntary remedial action by the property owner and authorize DOE-initiated remedial action. Wash. Admin. Code 173-340-510; *see also Olds-Olympic*, 918 P.2d at 926 n.4. This approach reflects the DOE's stated regulatory policy:

> It is the responsibility of each and every liable person to conduct remedial action so that sites are cleaned up well and expeditiously where a release or threatened release of a hazardous substance requires remedial action. Potentially liable persons are encouraged to initiate discussions and negotiations with the department and the office of the attorney general that may lead to an agreement on the remedial action to be conducted with the state of Washington. The department may provide informal advice and assistance on the development of proposals for remedial action, as provided by WAC 173-340-515. Any approval by the department or the state of remedial action shall occur by one of the means described in subsections (2) and (3) of this section.

Wash. Admin. Code 173-340-510(1).

Subsection (2) of the DOE regulation identifies the two methods by which potentially liable persons may initiate remedial action: by consent decree under Wash. Admin. Code 173-340-520(1), or by requesting an agreed order under Wash. Admin. Code 173-340-530. An agreed order means the potentially liable person agrees to take specific steps to remediate the polluted site and the DOE agrees not to take enforcement action so long as the potentially liable person performs the necessary cleanup. Wash. Admin. Code 173-340-530(1).

Subsection (3) of the DOE regulation authorizes the DOE to initiate remedial action by: (1) "[i]ssuing a letter inviting negotiations on a consent decree under Wash. Admin. Code 173-340-520(2);" (2) "[r]equesting an agreed order under Wash. Admin. Code 173-340-530;" or (3) "[i]ssuing

sented two options to the receivership court: (1) sell the properties "as is," with a discounted sales price accounting for the pollution, or (2) remediate the pollution and then sell the properties. The court approved of a plan to sell the two properties "as is."

In 1996 and 1998, respectively, the Receiver sold the Renton and Marginal properties. The Marginal property sold for $500,000 and the Renton property for $3,001,000. The sales agreements for both properties disclosed that the lands were polluted and required the purchasers to take over responsibility for any cleanup the government — or the practicalities of the real estate market — might in the future demand. The agreements did not, however, commit the purchasers to remediate the properties on their own. Both agreements also provided that "[n]o amendment, change or modification of [the agreements] shall be valid, unless in writing and signed by the parties hereto."

## B.   *The Insurance Policies*

Industrial issued primary and excess insurance policies to the Sternoffs between 1980 and 1986. In relevant part, the policies[4] provide: "[Industrial] will pay on behalf of the insured all sums which the insured shall become legally obligated to

---

an enforcement order under Wash. Admin. Code 173-340-540." Wash. Admin. Code 173-340-510(3).

In addition to these cooperative approaches to cleaning up contaminated sites, the DOE retains the option of taking "appropriate remedial action on its own at any time." Wash. Admin. Code 173-340-510(4). The regulations also permit citizens to undertake, under certain circumstances, "independent remedial action[s]," i.e., cleanup efforts that are "without department oversight or approval and not under an order, agreed order or consent decree." Wash. Admin. Code 173-340-515(1).

[4]The policies at issue contain identical language with respect to the terms at issue in this litigation. The citations are to Industrial policy no. MP 811-1439, the only policy actually included in the record.

pay as damages because of [property damage] . . . .” Under the policies, Industrial also assumed “the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient . . . .” The policies do not define “damages,” “claim,” or “suit.” “Occurrence” is defined to mean “an accident, including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured[.]”

In a provision entitled “Insured’s Duties in the Event of Occurrence, Claim or Suit,” the policies required the Sternoffs to provide written notice of an “occurrence” to Industrial “as soon as practicable,” and, in the event a claim or suit is asserted against the Sternoffs, to “immediately forward” to Industrial all “demand, notice, summons or other process” received by the Sternoffs. In the same provision, the Sternoffs agreed not to “voluntarily make any payment, assume any obligation or incur any expense” related to any such claim.

## C. *Communication Between the Receiver and Industrial*

### 1. *Pre-Sale Communication*

On September 28, 1990, Goodstein wrote to Industrial, indicating that the Washington DOE had identified the Marginal and Renton sites as contaminated and stating that Goodstein had initiated a study to assess the damage and cost of cleaning up the land. The letter also stated: “We write to notify you that Sternoff *may make a claim* for cleanup and related costs under the insurance policies you issued in favor of Sternoff.” (Emphasis added). Copies of the relevant policies were requested, and in closing, the letter stated, “After we have had an opportunity to review the policies, we *may* make a more formal claim for coverage of the cleanup costs.” (Emphasis added).

Internal documents indicate that Industrial understood the September 28, 1990 letter to be asserting a claim for the cleanup and other related costs. Industrial wrote a letter to Goodstein on October 19, 1990 "acknowled[ing] receipt of the captioned claim," and indicating that it was attempting to find the Sternoffs' policies, as requested.

In a reply letter dated October 22, 1990, Goodstein acknowledged receipt of Industrial's October 19, 1990 letter, but stated: "Please note, however, in case there is any confusion, *we are not presently making any claims under th[e]se policies*. At present, we are simply asking to obtain copies of any policies, applications, etc. relating to insurance provided by Industrial Indemnity to Sternoff." (Emphasis added).

Industrial heard nothing more about the Sternoff policies thereafter, and in December 1992 closed the file for lack of activity. Before the file was closed, a summary of what was known regarding a possible claim, and a list of possible defenses, was prepared. The summary document indicated that no coverage position letter had been issued because no claim had been filed.

## 2.   *Post-Sale Communication*

On September 25, 1998, eight years after Goodstein told Industrial that he was "not presently making any claims" under the Sternoff policies, Goodstein sent a letter to Industrial indicating that the Renton and Marginal properties had been sold. Goodstein stated:

> Previous correspondence on my behalf had notified . . . Industrial Indemnity, as an insurer of Sternoff, of potential claims arising out of the environmental contamination of properties owned and/or operated by Sternoff. The extent of the contamination has now been more fully investigated, and the properties have now been sold. I am, therefore, now in a posi-

tion to fully present and settle the environmental claims related to those properties.

In that letter, Goodstein also stated:

> I hereby demand payment of $473,000 for the loss on the Marginal Way property, and $4.839 million for the loss on the Renton properties. These amounts are calculated based on the appraised value of the sites if uncontaminated less the sales price of the sites in their contaminated condition.

Industrial responded a month later with a letter disclaiming any coverage for the losses claimed by Goodstein on behalf of the Sternoffs.

## D.  *Procedural History*

Four years later, in 2002, Goodstein filed this lawsuit. The second amended complaint — the operative pleading for the purposes of this appeal — sought, in relevant part, a declaratory judgment that Industrial owed a duty to defend and to indemnify Goodstein under the CGL policies and asserted a claim for breach of contract based on Industrial's failure to fulfill those duties.

Industrial thereafter moved for summary judgment on the grounds that Goodstein's claimed losses due to the allegedly reduced proceeds[5] from the property sales were not covered by the policies and that Goodstein had never invoked the duty to defend.

In opposing the summary judgment motion, Goodstein

---

[5]For the purposes of the summary judgment motion, Industrial assumed that the Sternoffs received less money for the properties in their "as is" contaminated state than they would have had they first remediated the pollution.

offered evidence that he and the purchaser of the Renton property, Zelman Renton LLC ("Zelman"), had entered into an oral agreement "to ensure that all rights to insurance coverage for environmental damage at the Renton site are consolidated and assigned to the Receiver." Specifically, the declaration stated that "the Receiver and Zelman have agreed that: 1) all rights the Receiver had to insurance coverage for environmental contamination will be transferred to Zelman; and 2) Zelman will transfer all rights it has to insurance coverage back to the Receiver." The declaration attesting to the cross-assignment indicated that "[t]he agreement has not yet been finalized." No such agreement evidencing the transfer and cross-transfer was submitted in support of Goodstein's opposition to summary judgment.

The district court granted Industrial's summary judgment motion on July 11, 2005, finding that Industrial had neither a duty to defend nor a duty to indemnify Goodstein under the policies. In rendering its decision, the court did not consider the evidence purporting to establish a cross-assignment.

Goodstein thereafter filed a motion for reconsideration, this time supported by a new declaration that stated that "all the material terms [of the cross-assignment agreement] had been negotiated by, agreed to, and known to the parties as of January 27, 2005." A written cross-assignment agreement was also submitted as evidence. The district court denied the motion for reconsideration on August 5, 2005, holding that Goodstein failed to comply with the local rules governing such motions.

Goodstein timely filed the instant appeal. On appeal, Goodstein challenges the district court's failure to consider the cross-assignment evidence at the summary judgment and reconsideration stages, as well as the district court's grant of summary judgment for Industrial on Goodstein's duty to indemnify and duty to defend claims.[6]

---

[6]On appeal, we "review de novo a grant of summary judgment and must determine whether, viewing the evidence in the light most favorable to the

## II.

Before proceeding to evaluate the merits of the district court's summary judgment order, we first address whether the court erred in (1) refusing to consider Goodstein's cross-assignment evidence submitted in opposition to the summary judgment motion, and (2) denying Goodstein's motion for reconsideration predicated on additional evidence of the cross-assignment.

Goodstein asserts that it offered evidence that Zelman, who purchased the Renton property, entered into an agreement with Goodstein "in principle to cross-assign rights to insurance coverage, such that all of the rights [Goodstein] had were transferred to Zelman and all of the rights that Zelman had were then transferred back to [Goodstein]." In so doing, Goodstein argues, the agreement "created an indisputable damages claim, since Zelman paid the costs to remediate the Renton property." Because we hold that the district court properly declined to consider the cross-assignment evidence at summary judgment and properly refused to reconsider that decision, we do not address the possible impact of the alleged cross-assignment on Goodstein's substantive claims.

### A. *Cross-Assignment Evidence at Summary Judgment Stage*

The district court did not abuse its discretion by declining to consider the cross-assignment evidence submitted at the summary judgment stage.[7] *See Orr v. Bank of Am., NT & SA*,

---

nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

[7]Although the Sternoffs argue that the district court simply ignored the cross-assignment evidence, the summary judgment order indicates otherwise. The district court noted the evidence but explained that "this agreement was only mentioned briefly by Plaintiff and not in a way that put the substance or validity of this agreement properly before the Court for consideration."

285 F.3d 764, 773 (9th Cir. 2002) (reviewing trial court's refusal to consider inadmissable evidence at summary judgment under abuse of discretion standard). Goodstein argues that he had reached an oral agreement concerning the assignments, and that the declaration properly served as evidence of its existence. He asserts that "testimony of an agreement is adequate to prove its existence," and that oral agreements are enforceable if they set forth all material terms of the agreement and provide that the parties will later memorialize the agreement.

**[1]** The evidence Goodstein submitted in opposition to summary judgment, however, indicates that no definitive agreement had actually been reached: "The Receiver has reached an agreement *in principle* with Zelman . . . . The agreement *has not yet been finalized*." (Emphasis added). So, contrary to Goodstein's assertion, the declaration did not state that the parties had already agreed to the final terms but would memorialize them later. *Cf.* Restatement (Second) of Contracts § 26. Moreover, the sales agreement executed by Zelman and Goodstein, which the cross-assignment purported to modify, made clear that only written, signed agreements could supersede or amend the original sales agreement.

**[2]** Given these circumstances, the evidence submitted in opposition to summary judgment is insufficient to prove the existence of an enforceable contract under Washington law.[8] For an agreement to be enforceable, "the terms assented to must be sufficiently definite, [and] the contract must be supported by consideration." *Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004) (citation omitted). Moreover, testimony attesting to the existence of an oral contract must describe the "essential terms" of the agreement. *See Hansen v. Transworld Wireless TV-Spokane, Inc.*, 44 P.3d

---

[8]Washington substantive law governs this dispute, which is predicated on diversity jurisdiction. *See Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1556 (9th Cir. 1991).

929, 938 (Wash. Ct. App. 2002). The declaration submitted by Goodstein discloses no pertinent details of the purported cross-assignment, including what consideration supported the parties' agreement.[9] Because the purported agreement was admittedly not final, not in writing, despite the requirement in the original contract, and the evidence failed to sufficiently detail its terms, the district court did not abuse its discretion in declining to consider the cross-assignment evidence.

## B. *Cross-Assignment Evidence at Reconsideration Stage*

The district court also properly declined to reverse its summary judgment ruling on the basis of evidence submitted in support of Goodstein's motion for reconsideration. "We review a district court's denial of a motion for reconsideration for an abuse of discretion." *M2 Software, Inc. v. Madacy Entmt.*, 421 F.3d 1073, 1086 (9th Cir. 2005).

[3] The district court refused to reconsider the cross-assignment issue because Goodstein failed to meet the standard for such motions laid out in the local rules. The Western District of Washington Local Rules provide that motions for reconsideration are disfavored, and will be granted only upon, in pertinent part, "a showing of new facts . . . which could not have been brought to [the court's] attention earlier with reasonable diligence." W.D. Wash. Local R. 7(h).

---

[9]In support of his argument, Goodstein cites *Cable & Computer Technology Inc. v. Lockheed Sanders, Inc.*, 214 F.3d 1030 (9th Cir. 2000). *Cable & Computer* is, as an initial matter, nonbinding authority, as it concerned California rather than Washington law. *Id.* at 1033. Moreover, instead of helping Goodstein, the case simply highlights the deficiencies in the evidence submitted to the district court. *Cable & Computer* found the oral contract at issue to be a valid final agreement, rather than an unenforceable "naked agreement to agree," because the evidence submitted described the terms of the agreement and noted the amount of consideration paid. *Id.* at 1035. Here, by contrast, the declaration is cursory and vague, and does not describe any consideration due under the agreement.

**[4]** Goodstein's new evidence indicated that, "[w]hile the agreement was not memorialized to [sic] writing by the time" the original declaration in opposition to summary judgment was submitted, "all the material terms had been negotiated by, agreed to, and known to the parties as of January 27, 2005." Yet, the declaration submitted in January in opposition to summary judgment did not recite the terms contained in the written document dated more than seven months later and submitted in support of reconsideration. Because those terms were, according to Goodstein, fully settled at the time the opposition to summary judgment was filed in January, the July submission on reconsideration fails of its own weight: According to that submission, the precise terms of the cross-assignment agreement *could* have been brought to the district court's attention in January, as they were "negotiated, agreed to, and known to the parties" by then. Goodstein's motion for reconsideration therefore did not meet the burden imposed by the Local Rules. W.D. Wash. Local R. 7(h); *see also Shalit v. Coppe*, 182 F.3d 1124, 1132 (9th Cir. 1999) ("[R]econsideration is appropriate only in very limited circumstances, and . . . the overwhelming weight of authority is that the failure to file documents in an original motion or opposition does not turn the late filed documents into newly discovered evidence." (alteration and internal quotation marks omitted)).

**[5]** Accordingly, we conclude the district court did not abuse its discretion in excluding the cross-assignment evidence at summary judgment and in denying Goodstein's motion for reconsideration. We therefore need not consider the possible impact of the alleged cross-assignment of rights on Goodstein's substantive claims for coverage under Industrial's CGL policy. We turn to those claims next.

### III.

Goodstein challenges the district court's conclusion that Industrial had no duty to indemnify the receiver for the differ-

ence between the sale price received for the polluted properties and the fair market value of the land had it been cleaned up prior to sale. We agree that the policy does not provide for such indemnity. We cannot, however, adopt the rationale asserted by the district court, as Industrial urges.

In finding that Industrial had no indemnification duty under the policy, the district court first emphasized that Washington adheres to a strict distinction between third and first party insurance. *See Olds-Olympic*, 918 P.2d at 930 (Wash. 1996). Given the fact that Industrial's policy was designed to protect third party harm, the district court reasoned, the policy provision obligating Industrial to pay " 'on behalf of the insured,' rather than to the insured" must be read literally, to provide only for "indemnify[ing] the insured for someone else's loss, not for the insured's own loss," and thus to preclude coverage for the decreased sale price.

**[6]** The Washington Supreme Court, however, has demonstrated a marked willingness to take a view of policy language in the context of insurance coverage for environmental cleanup claims sufficiently expansive to preclude such literalism. For example, in *Boeing Co. v. Aetna Casualty & Surety Co.*, 784 P.2d 507 (Wash. 1990), which concerned a CGL policy identical to the one at issue here, the Washington Supreme Court interpreted the policy to provide coverage beyond the literal scope of the policy's language. The specific question certified to the court in *Boeing* concerned whether environmental cleanup costs incurred by an insured constituted "damages" under a CGL policy. *Id.* at 516. In concluding that such costs are within the scope of CGL coverage, the court necessarily rejected the notion that the policy covers only sums paid to the third party damaged by the insured's actions. In other words, *Boeing* held remediation costs covered under a third-party liability policy even though the insurer was to pay the insured for costs incurred, rather than paying the party to whom the insured was actually "liable" for the property damage — i.e., the EPA and/or the Washington

DOE. Yet, the literal language of the policy, as interpreted by the district court in this case, would appear to prohibit such coverage. Thus, Goodstein's claim cannot fail simply because it is not a request for a payment made to a harmed third party.

So recognizing, Goodstein argues that the claim for the diminution in value of the land due to the pollution should be covered because it is a functional approximation of the cost to remediate the properties, which Industrial would be liable to pay under *Boeing* and *Weyerhaeuser Co. v. Aetna Casualty & Surety Co.*, 874 P.2d 142 (Wash. 1994).[10] In support of this argument, Goodstein urges us not to confuse form and substance: "Washington courts have taken a more pragmatic approach and have refused to allow a forfeiture of coverage based on an insurer's superficial objections to the *form* that a claim takes, especially where the *substance* of the claim is identical to what the insurance covers," citing *Boeing*.

But the instant land sale contracts do not amount to the functional equivalent of the claims in *Boeing* and *Weyerhaeuser* in one crucial respect: Neither contract required the buyer actually to remediate the pollution as a condition of sale. Because of that omission, this case is fundamentally different from the situation presented in both *Boeing* and *Weyerhaeuser*.

[7] The rationale for finding coverage in those two cases is that the third party injured by the insured's bad act is made whole through the insurer's payments for cleanup costs. The plaintiffs in *Boeing* and *Weyerhaeuser* actually cleaned up the polluted land, thus remedying the harm to the public caused by the contamination. The covered damages were incurred as part of that effort. As the court in *Boeing* explained, the CGL

---

[10]The Washington Supreme Court extended *Boeing*'s holding in *Weyerhaeuser*, concluding that CGL policies cover environmental cleanup costs incurred by the insured even where no administrative agency has taken official adversarial action. *Weyerhaeuser*, 874 P.2d at 145.

policies cover as "damages" an insured's obligation to pay environmental response costs because "the substance of the claim for response costs in the present case concerns compensation for *restoration* of contaminated water and real property." 784 P.2d at 515 (emphasis added).

[8] In this case, however, Goodstein would have Industrial compensate him when he has not taken any action to ensure — either by procuring clean up services himself *or* by requiring the buyer of the contaminated land to do so — that the harm caused by the Sternoffs' polluting activities has been or will be remedied. Indeed, the record indicates that while one of the properties was cleaned up by the purchaser, the other remains polluted almost ten years after the sale and over fifteen years after the government first identified the land as containing hazardous waste.

This holding does not elevate form over substance, as Goodstein suggests. Rather, it draws a line consistent with Washington's expressed preference for encouraging prompt, voluntary remediation of pollution in the insurance coverage context.

The Washington Supreme Court articulated such a concern in *Weyerhaeuser*. *Weyerhaeuser* acknowledged that special considerations inform coverage disputes in the environmental claims context, because environmental statutes impose strict liability on polluters "in order to safeguard society in general." 874 P.2d at 152. The court then cited the concerns expressed by commentators and the DOE that precluding coverage of voluntary clean up costs under CGL policies would "create[ ] a disincentive to engage in independent cleanups," and that, as a result, "the environment will suffer severe harm if owners have to postpone a cleanup until a clear third party claim prompts a lawsuit." *Id.* at 151-52. *Weyerhaeuser*'s discussion of these potential harms demonstrates a concern with encouraging prompt remediation of the harm caused to the

public by pollution with a minimum of transaction costs to the government.

Echoing the Washington Supreme Court is the Insurance Commissioner, who articulated the state's basic position on environmental claims by declaring:

> It is in the public interest to reduce the costs incurred in connection with environmental claims and to expedite the resolution of such claims. The state of Washington has a substantial public interest in the timely, efficient, and appropriate resolution of environmental claims involving the liability of insureds at polluted sites in this state. This interest is based on practices favoring good faith and fair dealing in insurance matters and on the state's broader health and safety interest in a clean environment.

Wash. Admin. Code 284-30-900(1).

[9] In this case, Goodstein presumably did receive a significantly reduced price for the sale of the properties due to their pollution. We believe, however, that Washington courts would not find that loss covered under Industrial's policy, as Goodstein failed to ensure that the polluted properties would be cleaned up promptly. Again, the purchase agreements contained no cleanup condition. In economic terms, it is probable that the reduced purchase price represented a calculation premised on the probable cost of remediation as discounted by a factor representing the probability that the costs would actually be incurred and, if so, how far in the future. The reduction in price for the cleanup costs was thus almost surely not equivalent in amount to the present cost of prompt cleanup. And the purchaser retained the right, and had an incentive, to contest any specific government-imposed cleanup requirements, as well as to delay incurring cleanup costs as long as possible.

**[10]** Furthermore, the language of the policy supports our conclusion that Goodstein's claim for diminution in value cannot be covered under Industrial's policy. First, diminution in value does not alone constitute "property damage" where the policy language requires "physical injury to tangible property."[11] In *Guelich v. American Protection Ins. Co.*, 772 P.2d 536 (Wash. Ct. App. 1989), the issue was whether a homeowner's umbrella liability insurer had a duty to defend him in a view obstruction suit. The court held that diminution in property value resulting from an obstructed view does not constitute a "physical injury to tangible property" that would give rise to the duty to defend, because such diminution is not itself a physical injury, and a view is not tangible property.[12] *Id.* at 538. Thus, it appears that under Washington law, diminution in property value would not be covered as property damage under the "physical injury" language of the Industrial general liability policy. *See also New Hampshire Ins. Co. v. Viera*, 930 F.2d 696, 701 (9th Cir. 1991) ("[W]e are persuaded that diminution in value is not 'physical damage' to 'tangible property' " under California law); *Auto-Owners Ins. Co. v. Carl Brazell Builders*, 588 S.E. 2d 112, 116 (S.C. 2003) ("Most courts hold the diminished value of tangible property does not constitute property damage within the meaning of CGL policies which define property damage as physical injury.").

**[11]** Nor can diminution in value fall within the realm of "damages" that the "insured shall become legally obligated to pay" because of "property damage." While Washington courts have interpreted such "damages" to include response costs

---

[11]The Industrial policy defines "property damage" as "physical injury to or destruction of tangible property" or "loss of use of tangible property."

[12]The *Guelich* court cited *Prudential Prop. & Cas. Ins. Co. v. Lawrence*, 724 P.2d 418 (Wash. Ct. App. 1986), as persuasive authority. In *Prudential*, the court found a duty to defend in a view obstruction suit where the policy language did not include the limiting term "physical"; however, the court implied that a different policy by the same insurer requiring "physical injury" would not have created a duty to defend.

incurred by insureds in cooperation with an environmental agency, *see Weyerhaeuser*, 874 P.2d at 145; *Boeing*, 784 P.2d at 515, they have never extended such interpretation to include diminution in property value as a surrogate for response costs never incurred. Here, there is no indication that the Sternoffs or Goodstein incurred any clean-up expenses or compensated an environmental agency for its response costs; indeed, they were "not required to *expend* any money . . . ." *Block v. Golden Eagle Ins. Co.*, 121 Cal. App. 4th 186, 196 (2004) (holding that diminution in property value does not constitute "damages" under a liability policy). Furthermore, Goodstein did not "constructively" expend any money for remediation, because the sale was not conditioned on remediation that the buyer would perform with the money saved from the reduced purchase price.[13]

[12] Accordingly, we affirm the district court's holding that Industrial had no obligation to indemnify Goodstein for the loss associated with the sale of the polluted properties under the policy.[14]

---

[13]A contrary finding "would essentially convert a liability policy to one that insures against a diminution in market value." *Block*, 121 Cal. App. 4th at 196. Moreover, it would create perverse incentives for landowners to sell contaminated properties "as is" at fire sale prices and reap a windfall from their insurers under the guise of "diminution in market value" damages.

[14]As an alternative argument, Goodstein also asserts that Industrial should be liable for coverage under a waiver and/or estoppel theory. In support of that proposition, Goodstein argues that Industrial was aware that Goodstein was filing a claim for coverage in his September 1990 letter but elected not to assert a reservation of rights or deny coverage. Goodstein makes no attempt to show that Industrial knew he was seeking to invoke coverage and made a conscious decision not to raise any defenses to coverage. *See Dombrosky v. Farmers Ins. Co. of Wash.*, 928 P.2d 1127, 1134 (Wash. Ct. App. 1996). Indeed, as Goodstein himself stated in his October 1990 letter that he did not understand the September 1990 letter to be a claim for coverage, he is ill-positioned to maintain that Industrial should have interpreted it as such. Further, Industrial's internal documents indicate only that it was preparing to assert defenses should Goodstein ever tender a claim for coverage, not that it considered that one had already been made. For the same reason, Goodstein has not shown reasonable reliance on any representation, express or implied, by Industrial, a required element of equitable estoppel. *Id.*

**IV.**

Goodstein also challenges the district court's grant of summary judgment for Industrial on the duty to defend claim.

**A.  *Duty to Defend vs. Duty to Indemnify***

**[13]** The district court held that Industrial had no duty to defend Goodstein because the policy clearly did not cover his claim for diminution in value damages. While it is true that the duty to defend does not arise for " 'claims which are *clearly* not covered by the policy,' " an insurer has a duty to defend whenever "the insurance policy *conceivably* covers the allegations." *Woo v. Fireman's Fund Ins. Co.*, 164 P.3d 454, 459 (Wash. 2007) (en banc) (quoting *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d 1124 (Wash. 1998) (en banc)) (emphasis added). According to Goodstein, the DOE's allegations of contamination created a duty to defend, because claims for environmental remediation are potentially covered under the Industrial policy.

As an initial matter, we note that whether DOE's actions in declaring the Sternoff properties polluted constituted a "suit" within the meaning of the policy is an open issue under Washington law. The Washington Supreme Court has repeatedly declined to resolve the issue. *See Olds-Olympic*, 918 P.2d at 928 n.7 (observing that "[c]ase law from around the country . . . is split on what constitutes a 'suit' for purposes of the duty to defend in environmental cleanup cases" and declining to resolve the issue); *Weyerhaeuser*, 874 P.2d at 148 (same). But Industrial has not argued in this court that the government's conduct related to the polluted properties did not constitute a "suit," so we do not endeavor to resolve the issue. Instead, we assume that the DOE designation of the property was a "suit."

**[14]** So assuming, the issue is whether Industrial would have been potentially liable for response costs under the policy. Because Washington courts agree that environmental

response costs can constitute covered "damages" under CGL policies, *see Boeing*, 784 P.2d at 515, we are satisfied that the DOE action implicated Industrial's duty to defend.

That Goodstein ultimately did not pay any response costs is irrelevant to whether a duty to defend existed while such response costs were potentially payable, because "[u]nder Washington law, the duty to defend and the duty to indemnify are separate obligations," *Dewitt Constr. v. Charter Oak Fire Ins. Co.*, 307 F.3d 1127, 1137 (9th Cir. 2002), and "should be examined independently," *Weyerhaeuser*, 874 P.2d at 148. However, once Goodstein sold the properties without performing any remediation, he converted the response costs, which may have been covered under the policy, into an economic loss that clearly fell outside the scope of coverage. Hence, while the duty to defend began at the time of the DOE action, it terminated upon the sale of the properties. *See Overton v. Consol. Ins. Co.*, 38 P.3d 322, 334 (Wash. 2002) ("An insurer's duty to defend is a continuing one, and does not end until the underlying action is resolved or it is shown that *there is no potential for coverage*.") (emphasis added). We therefore analyze the duty to defend solely with respect to the time period from the DOE action up to the sale of the properties.

## B. *Invocation of the Duty to Defend*

Industrial argues that we need not further concern ourselves with whether the duty to defend was breached, because Goodstein's claim that it was comes much too late. Given that the duty to defend can be breached without implicating the duty to indemnify, our analysis of the timing issue begins with when, if at all, Goodstein invoked the duty to defend in the first instance.

### 1. *1990 Letters*

Goodstein asserts that he invoked the duty via the September 28, 1990 letter, which he claims gave Industrial notice of

the fact that the DOE had declared the properties polluted.[15] A review of the full record before us, however, makes clear that this position is untenable.

**[15]** Washington courts have rejected the notion that "a tender of defense is sufficient if the insured puts the insurer on notice of the claim." *Unigard Ins. Co. v. Leven*, 983 P.2d 1155, 1160 (Wash. Ct. App. 1999). "[A]n insurer cannot be expected to anticipate when or if an insured will make a claim for coverage; the insured must affirmatively inform the insurer that its participation is desired." *Id.*; *see also Griffin v. Allstate Ins. Co.*, 29 P.3d 777, 782 (Wash. Ct. App. 2001); *Time Oil Co. v. Cigna Prop. & Cas. Ins. Co.*, 743 F. Supp. 1400, 1420 (W.D. Wash. 1990). Goodstein's October 22, 1990 letter went to great pains to inform Industrial that no claim had been made: "Please note, however, in case there is any confusion, *we are not presently making any claims under the policies*." (Emphasis added). Far from informing Industrial that its participation was desired in any investigation, negotiation or defense regarding the extent of Goodstein's liability for the pollution, *see Unigard*, 29 P.3d at 782, Goodstein specifically disclaimed any intent to invoke coverage under the policies. Goodstein cannot now claim Industrial's duty to defend arose as a result of that early correspondence.

### 2. *Failure to Invoke the Duty*

Industrial's position is just as unpersuasive. Industrial asserts, as it also did in the district court, that it could not have breached the duty to defend because Goodstein *never* invoked that duty. Accordingly, Industrial argues, because the duty to

---

[15]To support their claim that the September 28, 1990 letter invoked a duty to defend, Goodstein points to the fact that he mailed a similar letter to other insurers and those insurers responded by sending Goodstein reservation of rights letters. There is nothing in the record, however, to suggest that those insurers also received letters similar to the October 20, 1990 letter sent to Industrial.

defend never arose in the first place, Washington's late notice rule,[16] under which an insurer must prove that the insured's delay in tendering the defense claim caused the insurer "actual and substantial prejudice" to avoid liability for defense costs, does not apply.[17] *See Mutual of Enumclaw Ins. Co. v. USF Ins. Co.*, 153 P.3d 877, 882 (Wash. Ct. App. 2007); *see also Pub. Util. Dist. No. 1 v. Int'l Ins. Co.*, 881 P.2d 1020, 1029 (Wash. 1994); *Griffin*, 29 P.3d at 782.

[16] Industrial's argument is creative, but it cannot fly. As an initial matter, Industrial cites no case law supporting the notion that there is a meaningful distinction between a late invocation of the duty to defend and a failure ever to invoke that duty.[18] That is probably because, as a matter of both

---

[16]Industrial has stated specifically and repeatedly that it is not asserting a late notice defense. In its brief to this court, Industrial declared that it "was not asserting late notice as a defense to coverage, it was moving to dismiss [the duty to defend claim] on the grounds that a defense was never requested." Similarly, Industrial informed the district court that it "ha[d] not asserted late notice" as a defense to coverage in its summary judgment motion.

[17]We note that the prejudice requirement is not limited to circumstances concerning late notice. Washington also, for instance, requires proof of prejudice where the insurer asserts as a defense to liability that the insured breached the policy's cooperation clause, which precludes coverage where the insured litigates or settled a lawsuit without involving the insurer. *E.g.*, *Ore. Auto. Ins. Co. v. Salzberg*, 535 P.2d 816, 819 (Wash. 1975); *see also Pederson's Fryer Farms, Inc. v. Transamerica Ins. Co.*, 922 P.2d 126, 131 (Wash. Ct. App. 1996) (stating general rule that "[e]ven where an insured breaches the insurance contract, the insurer is not relieved of its duty to pay unless it can prove actual and substantial prejudice caused by the insured"). Industrial has not argued in this court that Goodstein breached the cooperation clause, nor has it put forth a theory of prejudice arising from such a breach. We therefore do not address the impact of the policy's cooperation clause. Should the issue be raised on remand, the district court may, of course, address it.

[18]Industrial's argument is predicated on *Unigard*'s statement that to invoke the duty to defend, "the insured must affirmatively inform the insurer that its participation is desired." 983 P.2d at 1160. Assuming that the filing of this lawsuit somehow failed to satisfy that standard, *Unigard*

Washington law and of simple logic, it makes no sense to say that a duty to defend was never invoked when, as here, the insured has sued the insurer for a breach of the duty to defend. The filing of the lawsuit itself constitutes a request for payment of defense costs under the policy,[19] and at that point, the late notice rule applies.

The logic of a recent Washington Court of Appeals case illustrates the point by analogy. In *Mutual of Enumclaw*, 153 P.3d 877, the insured was sued for construction defects. The insured tendered indemnification and defense claims to two insurance companies (collectively "Enumclaw"), but specifically decided not to tender the claims to a third ("USF"). *Id.* at 879-80. Enumclaw then settled the lawsuit. *Id.* at 880. As part of the settlement, the insured assigned its rights under all other policies to Enumclaw. *Id.*

Enumclaw later discovered the USF policy and sued USF for contribution. *Id.* The trial court granted summary judgment for USF, holding that USF was "excused from its duty to perform under its policy or to contribute to a settlement procured by a coinsurer," because the insured had affirmatively chosen not to tender the claim to USF. *Id.* The Washington Court of Appeals reversed, holding that Enumclaw, standing in the shoes of the insurer, could invoke the late tender rule through the instant lawsuit. *Id.* at 878, 881-82. Consequently, the court held, USF would be liable to contribute

---

does not support the notion that Industrial can avoid liability without proving prejudice. After the quoted statement, the *Unigard* court went on to engage in prejudice analysis, *id.* at 1161-63, which suggests that even if the insured does not affirmatively inform the insurer that a defense is desired, the insurer remains liable for the breach of the duty to defend absent proof of "actual and substantial prejudice." *See Enumclaw*, 153 P.3d at 882.

[19]Industrial has not argued in this court that the government's conduct related to the polluted properties did not constitute a "suit," and we therefore do not consider the issue here.

unless it could prove actual and substantial prejudice. *Id.* *Enumclaw*'s logic dictates that even if a claim for defense costs is never made until after the lawsuit is settled, and even if that claim is asserted in the form of a coverage suit rather than by a letter to the insurer demanding a defense or submitting defense costs, the insurance company is still liable for the defense costs absent evidence of substantial prejudice.

**[17]** Accordingly, the fact that Goodstein may never have tendered a defense request to Industrial before filing this lawsuit[20] does not relieve Industrial of its obligation to prove prejudice.

---

[20]We note that even if Goodstein can show a breach of the duty to defend upon remand, he will not be able to recover as damages the amount by which the property value was depressed due to its polluted state. "[T]he well-accepted measure of damages for a good faith, but unjustified breach [of the duty to defend is] the costs and reasonable attorneys' fees incurred by the insured in defending itself plus consequential damages that the insured incurred as a result of the breach." *Underwriters at Lloyds v. Denali Seafoods, Inc.*, 927 F.2d 459, 464 (9th Cir. 1991) (applying Washington law). The discounted price Goodstein received for selling the land "as is" cannot possibly be considered to have been caused by Industrial's failure to defend. And, given our conclusion that Goodstein did not invoke the duty to defend until he filed this lawsuit, well after the sale of the polluted properties was completed, the decision to sell for a depressed price cannot be traced to any breach of the duty to defend either. Goodstein's diminution in value loss, then, did not come about as "*a result of* the breach" and is not recoverable as damages for the alleged breach of the duty to defend. *See id.*

If Goodstein can establish a breach of the duty to defend upon remand, consequently, he will be able at most to recover as damages any pre-transfer costs incurred in defending, including, for example, costs incurred in investigating the environmental contamination such as hiring an expert to assess the pollution. *See Unigard*, 983 P.2d at 1159 & n.9; *cf. Truck Ins. Exch. v. VanPort Homes, Inc.*, 58 P.3d 276, 281 n.5 (Wash. 2002) ("An insurer may be responsible for defense costs prior to tender.").

### 3. *Prejudice*

**[18]** Industrial cannot establish prejudice as a matter of law on the record before us. The existence of prejudice is a question of fact, *Tran v. State Farm Fire & Cas. Co.*, 961 P.2d 358, 365 (Wash. 1998), as to which the insurer "has the affirmative burden of proof," *Pulse v. Nw. Farm Bureau Ins. Co.*, 566 P.2d 577, 579 (Wash. Ct. App. 1977). To establish prejudice, Washington courts "reject speculation, and require evidence of concrete detriment resulting from delay, together with some specific harm to the insurer caused thereby." *Canron, Inc. v. Fed. Ins. Co.*, 918 P.2d 937, 941 (Wash. Ct. App. 1996); *see also Unigard*, 983 P.2d at 1161 ("To establish actual prejudice, the insurer must demonstrate some concrete detriment, some specific advantage lost or disadvantage created, which has an identifiable prejudicial effect on the insurer's ability to evaluate, prepare or present its defenses to coverage or liability.").

**[19]** Industrial has never articulated any theory of prejudice in this action, nor has it proffered any evidence in support of such a defense. Instead, it points to the fact that Washington courts have, on occasion, found prejudice as a matter of law and suggests we do the same.[21] *See, e.g.*, *Nw. Prosthetic v. Centennial Ins.*, 997 P.2d 972, 975-96 (Wash. Ct. App. 2000); *Unigard*, 983 P.2d at 1163; *see also Twin City Fire Ins. Co. v. King County*, 749 F. Supp. 230, 233-34 (W.D. Wash. 1990), *aff'd*, 942 F.2d 794 (9th Cir. 1991) (unpublished). Such cases are not the norm, however — they are "extreme

---

[21]Washington state courts sometimes refer to the existence of a presumption of prejudice, citing *Felice v. St. Paul Fire & Marine Ins. Co.*, 711 P.2d 1066 (Wash. Ct. App. 1985). *See, e.g.*, *Pub. Util. Dist. No. 1*, 881 P.2d at 1029. However in *Felice*, the court did not merely presume prejudice but found *actual* prejudice, because the insured had already proceeded to trial before informing the insurance company. *Felice*, 711 P.2d at 1071 ("This actually prejudiced [the insurer] because it precluded the opportunity to evaluate the facts and determine whether a trial and expenses for an appeal were warranted.").

cases." *Pub. Util. Dist. No. 1*, 881 P.2d at 1029; *Pulse*, 566 P.2d at 579; *see also Pederson's Fryer Farms, Inc. v. Transamerica Ins. Co.*, 922 P.2d 126, 132 (Wash. Ct. App. 1996) (recognizing that "Washington courts have found prejudice as a matter of law in only a few cases").

Moreover, even in these "extreme" cases the Washington courts engaged in a close evaluation of the specific injury alleged by the insurer, such as the loss of opportunity to mount a viable defense or the loss of opportunity to investigate a questionable claim against the insured, before concluding that prejudice existed as a matter of law. *See Nw. Prosthetic*, 997 P.2d at 973, 976 (finding prejudice established as a matter of law where insured settled a debatable defamation claim before the insurer had a meaningful opportunity to investigate it, and the settlement was "achieved by parties who shared an interest in characterizing the $325,000 payment as defamation damages," because that was the only claim covered under the policy); *Unigard*, 983 P.2d at 1161-63 (concluding insurer established prejudice as a matter of law where insurer lost the opportunity to mount the defense that its insured was not a strictly-liable "former operator" of contaminated site, which could have been based on insured's own statement that he had no "operations or involvement" in the site); *see also Tran*, 961 P.2d at 365-66 (finding actual prejudice as a matter of law where insured's refusal to provide financial documents containing material information not available from any other source prevented the insurer from being able to investigate the possibility that the insured's claim was fraudulent). Industrial has not asserted that any similar situation existed here.

Indeed, Washington has expressly refused to find prejudice as a matter of law in an environmental cleanup case where because of late notice the polluted property was investigated, assessed by experts, and completely remediated without the insurer's participation. *Pederson's Fryer Farms*, 922 P.2d at 130-32. The court in *Pederson's Fryer Farms* denied Trans-

america's motion for directed verdict on the prejudice issue because "Transamerica fail[ed] to indicate how this delay hampered its ability to investigate, evaluate or defend against the State's assertion that Pederson's was required to remedy the contamination." *Id.* at 132. Moreover, "Pederson's did not deprive Transamerica of its right to control the litigation, as no action was filed against Pederson's." *Id.* Finally, the court rejected Transamerica's argument that it could have disputed Pederson's liability for the cleanup costs because there was no evidence even arguably falling within any of the narrow exceptions to the Model Toxic Act's strict liability provisions. *Id.* at 132-33. As in *Pederson's Fryer Farms*, there is no evidence in the record of this case suggesting Industrial could have taken any steps to mitigate or dispute Goodstein's liability for the pollution, or that Industrial was in any other way damaged by Goodstein's alleged breach.

[20] In sum, Industrial has in its motion for summary judgment fallen short of meeting its burden to warrant judgment as a matter of law on the duty to defend claim. It has failed to demonstrate that this is such an "extreme" case that the prejudice determination should not be decided by a jury, as it normally is under Washington law. Indeed, Industrial has failed to articulate any theory at all by which it could be said to have suffered actual and substantial prejudice due to Goodstein's alleged breach of its obligations under the policy.

[21] We therefore reverse the district court's grant of summary judgment for Industrial on the duty to defend claim, as Goodstein invoked the duty by filing this lawsuit for damages and Industrial has failed to establish that it was prejudiced as a matter of law by Goodstein's late notice of the claim. We emphasize that we express no view on the merits of the duty to defend cause of action, including whether there was a duty to defend at all on these facts and whether, if so, any damages were incurred for its breach.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**